17921

The STATE, Respondent, v. Irene BROWN et al., Appellants

(126 S. E. (2d) 1)

358

*Messrs. Jenkins & Perry,* of Columbia, and *W. Newton Pough,* of Orangeburg, *for Appellants,*

*Messrs. Daniel R. McLeod, Attorney General,* and *Everett N. Brandon, Assistant Attorney General,* of Columbia,

and *Julian S. Wolfe, Solicitor,* of Orangeburg, *for Respondent,*

June 6, 1962.

LEWIS, Justice.

On March 15, 1960, 349 Negro students were arrested in the City of Orangeburg, South Carolina, and charged with the crime of breach of the peace. All were subsequently convicted in Magistrate's Court and sentenced to pay fines of Fifty ($50.00) Dollars or serve thirty (30) days in jail. All have appealed and, since they were charged in eight separate groups and each group tried separately, there are eight cases on appeal. However, because all of the cases involve basically the same issues and facts, they were consolidated for argument. The appeal in this case involves a group of fifteen defendants who were tried and convicted before the Magistrate and a jury, all of the remaining cases being tried before the Magistrate without a jury.

At the outset of their trials the defendants moved to dismiss the warrants against them on the ground that the information upon which the warrants were issued failed to fully set forth the crime charged. The motions were refused and such is the basis for one of the exceptions on appeal.

There can be no doubt that a person charged with a criminal offense has a constitutional right to be fully informed of the nature and cause of the offense with which he is charged, Article 1, Section 18 of the Constitution of South Carolina, and that the information upon which a prosecution is commenced in Magistrate's Court must so

allege. *State v. Randolph,* 239 S. C. 79, 121 S. E. (2d) 349. The question here is whether the warrants meet these requirements.

The warrants charged that the defendants "did commit breach of the peace by unlawfully and wilfully congregating and marching in the City of Orangeburg, said County, and did approach what is known as the business section of the City of Orangeburg, the groups being headed by a number of parties who refused to stop and return to the colleges upon the request of Chief of Police Hall and other officers in the City of Orangeburg, thereby disturbing the peace and tranquility of the normal traffic on the sidewalks as well as the streets in the City of Orangeburg, which caused fear and tending to incite a riot or other disorderly conduct or cause serious trouble."

We have recently had occasion to review the elements necessary to constitute the offense of breach of the peace in the case of *The State v. Edwards et. al.,* 239 S. C. 339, 123 S. E. (2d) 247. The foregoing warrants plainly and substantially charged, under our decisions, the crime of breach of the peace, fully informing the defendants of the nature and cause of the offense charged. The lower court properly refused to dismiss the warrants.

The defendants next assert that the State failed to prove the commission by them of the offense of breach of the peace and that their convictions were obtained in violation of their rights to freedom of speech and assembly and their right to petition for redress of grievances, protected by Article 1, Sections 4 and 5, Constitution of South Carolina, and the First and Fourteenth Amendments to the United States Constitution. All of these questions may be resolved by a determination of whether or not there is any competent evidence to sustain the conviction of the defendants for a breach of the peace.

The Orangeburg area, according to the testimony, has a population of approximately twenty thousand. Claflin Col-

lege and the South Carolina State College are located in Orangeburg, both attended solely by Negro students. It appears that, beginning about February 25, 1960, there began a series of demonstrations by the Negro students in the Orangeburg area in protest against racial segregation. On February 25, 1960, a group picketed in front of Kress' Store in the main business section of the City. On February 26, 1960 a larger group staged a "sit in" in Kress' Store. On March 1, 1960 there was a parade through the City by 600 to 700 Negro students.

As a result of these demonstrations the officers testified that very high tension and feeling was created among both the White and Negro races in the community. Two or three clashes between Negroes and White had occurred, resulting in arrests. In their efforts to maintain order among the citizens of the community, the City officials called to their assistance State law enforcement officers, the Mayor of the City publicly advised that no further marches or parades would be tolerated within the City without a permit, and a notice was read at the assembly hour at the South Carolina State College on March 2, 1960 informing the students that, before further parades or marches downtown, the City authorities would require that a permit be obtained.

Under the foregoing circumstances and without notice to the City officials, three groups of Negro students, totaling approximately one thousand left the campuses of the aforementioned colleges about 12 o'clock in the day of March 15, 1960 and proceeded to march, two abreast, along the sidewalks toward the main business section of the City of Orangeburg, each of the three groups taking a different route. The purpose of the procession of students, as testified by some of the defendants during the trial, was to petition the City officials of Orangeburg for redress of grievances in allegedly denying to them the right of peaceful assembly and of freedom of speech. However, no audience had been sought, or apparently intended, with any official of the City,

County or State government. They planned to proceed to the City Square where they would sing The Star Spangled Banner and pray, after which they would return to their respective campuses. The procession of students, under the State's testimony, blocked traffic, streets were cluttered, and the sidewalks were blocked to such an extent as to require pedestrian traffic to enter business establishments to get off the street. As the students proceeded toward the main business section of the City, the officers intercepted each group. They were in each instance asked by the officers to disperse and return to their schools. Some of the students acceded to the requests of the officers and others refused, persisting in continuing the march. The refusal to disperse in obedience to the command of the officers resulted in the arrest of the defendants and the issuance of warrants charging them with the offense of breach of the peace.

The record discloses that none of the defendants committed any act of violence. It is their basic contention that they had a right to assemble and act as they did, so long as they did no other act which was in itself unlawful.

In *State v. Edwards et al., supra,* 29 S. C. 339, 123 S. E. (2d) 247, 248, the following definition of breach of the peace, from 8 Am. Jur. 834, Section 3, was approved: "In general terms, a breach of the peace is a violation of public order, a disturbance of the public tranquility, by any act or conduct inciting to violence * * *, it includes any violation of any law enacted to preserve peace and good order. It may consist of any act of violence or an act likely to produce violence. It is not necessary that the peace be actually broken to lay the foundation for a prosecution for this offense. If what is done is unjustifiable and unlawful, tending with sufficient directness to break the peace, no more is required. Nor is actual personal violence an essential element in the offense." And, in *Cantwell v. Connecticut,* 310 U. S. 296, 60 S. Ct. 900, 84 L. Ed. 1213, 1220, 128 A. L. R. 1352, the United States Supreme Court in discussing the conflict be-

tween the assertion of constitutional rights by the individual and the power of the State to punish for breach of the peace stated: "The offense known as breach of the peace embraces a great variety of conduct destroying or menacing public order and tranquillity. It includes not only violent acts but acts and words likely to produce violence in others. No one would have the hardihood to suggest that the principle of freedom of speech sanctions incitement to riot or that religious liberty connotes the privilege to exhort others to physical attack upon those belonging to another sect. When clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order, appears, the power of the state to prevent or punish is obvious."

The defendants have the constitutional right to freedom of speech, assembly and to petition for redress of grievances. The fact that the defendants may have been at the time of their arrests attempting to assert such constitutional rights does not answer the question here. While the state must safeguard the constitutional rights of the defendants, it also has a duty to preserve the public peace and to assure the availability of the streets to serve the necessary requirements of the community. The constitutional guarantees which, admittedly, the defendants have a right to enjoy may not be asserted in any manner, regardless of any resulting peril to the community therefrom. The constitutional principles here invoked do not prohibit state action when a clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public peace or order appears.

The defendants were engaged at the time in expressing their opposition to racial segregation. The question of racial practices is a present and perplexing one, involving deep seated feelings and beliefs. Where issues are involved which so deeply affect the feelings and emotions of a people, incidents often precipitate open con-

flict which in other situations would go unnoticed. In urging the adoption of one's views it must be recognized that the constitutional right exists to oppose as well as to espouse a cause. It is clear, however, that unpopular views may not be silenced under the guise of the preservation of order. In the conflict of opposing ideas the rights of the contending factions must be balanced if the state is to exist and the constitutional rights of all preserved. Therefore, the principle has become fixed that, in exercising the rights guaranteed under the Constitution, one may not commit a breach of the peace. This is not a denial of those rights but rather a recognition that they can only exist in an orderly society.

Regardless of the difference in opinion that may be held as to the justification for the feeling in the community, the fact remains that the record justified the finding, inherent in the verdict, that on the occasion in question there existed in the Orangeburg area very high tension on the part of both Negroes and Whites, resulting from a series of demonstrations on the part of the Negro students. There had been clashes, resulting in arrests, between Negroes and Whites. These were realities which local officials had to recognize and in the light of which common prudence required that they act. The local officials sought to preserve the peace by public notices, by invoking a regulation against parades without a permit, and by bringing in additional officers. Heedless of the requests by the officials and in the face of the high tension between the races in the community, the Negro students, one thousand strong, on March 15, 1960, began a march by three diffeffrent routes into the congested business area of the City. There is absent from this record any showing or intimation that, had the defendants applied to the City officials for a permit to parade or sought in advance an audience with such officials, so that adequate police protection could be afforded and traffic conditions safeguarded, such permit would not have been issued or audience granted. As stated by the Circuit Judge in affirming the convictions of the defendants: "No action was taken until

the police authorities in their considered judgment came to the conclusion that the point had been reached where the action of the appellants was dangerous to the peace of the community. There is no indication whatever in this case that the acts of the police officers were taken as a subterfuge or excuse for the suppression of the appellants' views and opinions. The evidence is clear that the officers were motivated solely by a proper concern for the preservation of order and the protection of the general welfare in the face of an actual interference with traffic, and an imminently threatened disturbance of the peace of the community."

The evidence amply sustains the conviction of the defendants of the offense of breach of the peace.

The remaining question to be decided concerns the refusal of the Magistrate to grant the defendants' motion for examination of the jurors on their *voir dire*. This question concerns only the fifteen defendants involved in this case as the defendants in the other cases on appeal were tried by the Magistrate without a jury. These defendants made timely motion that the prospective jurors be examined on their *voir dire*. The Magistrate denied the motion and made no examination to determine whether bias or prejudice existed on the part of any juror. The sole question presented, and to which we limit our determination, is whether error was committed in the absolute refusal to make any examination of the prospective jurors as to possible bias or prejudice, when such request was timely made.

Trial by a jury was demanded by the defendants in accordance with the provisions of Section 43-115 of the 1952 Code of Laws, and Article 1, Section 18 of the Constitution of this State guaranteed to them the right to a trial "by an impartial jury."

Examination of prospective jurors on their *voir dire* is a guaranty of the right of the parties to an impartial jury. And, when timely request was made, it became the duty of the Magistrate to make reasonable inquiry of the jurors to

determine whether bias or prejudice existed, to the end that the constitutional right of the litigants to a trial by an imparial jury could be secured.

The question here is not as to the exercise of the trial Court's discretion in determining the impartiality of a juror, but concerns the absolute denial of an inquiry, after request, into such matter. The refusal of the Magistrate to examine the jurors on their *voir dire* so affects substantial rights of the defendants as to require reversal of the judgment herein and the granting of a new trial on that ground to the fifteen defendants in this case.

Reversed and remanded for a new trial.

TAYLOR, C. J., and MOSS, BUSSEY and BRAILSFORD, JJ., concur.