## CANTWELL ET AL. *v.* CONNECTICUT.

No. 632.   Argued March 29, 1940.—Decided May 20, 1940.

*Mr. Hayden C. Covington,* with whom *Mr. Joseph F. Rutherford* was on the brief, for appellants and petitioner.

*Messrs. Francis A. Pallotti,* Attorney General, and *Mr. Edwin S. Pickett,* with whom *Messrs. William L. Hadden,*

*Richard F. Corkey,* Assistant Attorney General, and *Luke H. Stapleton* were on the brief, for the State of Connecticut, appellee and respondent.

MR. JUSTICE ROBERTS delivered the opinion of the Court.

Newton Cantwell and his two sons, Jesse and Russell, members of a group known as Jehovah's Witnesses, and claiming to be ordained ministers, were arrested in New Haven, Connecticut, and each was charged by information in five counts, with statutory and common law offenses. After trial in the Court of Common Pleas of New Haven County each of them was convicted on the third count, which charged a violation of § 6294 of the General Statutes of Connecticut,[1] and on the fifth count, which charged commission of the common law offense of inciting a breach of the peace. On appeal to the Supreme Court the conviction of all three on the third count was affirmed. The conviction of Jesse Cantwell, on the fifth count, was also affirmed, but the conviction of Newton and Russell on that count was reversed and a new trial ordered as to them.[2]

By demurrers to the information, by requests for rulings of law at the trial, and by their assignments of error in the State Supreme Court, the appellants pressed the contention that the statute under which the third count was drawn was offensive to the due process clause of the Fourteenth Amendment because, on its face and as construed and applied, it denied them freedom of speech and prohibited their free exercise of religion. In like manner

---

[1] General Statutes § 6294 as amended by § 860d of the 1937 supplement.

[2] 126 Conn. 1; 8 A. 2d 533.

they made the point that they could not be found guilty on the fifth count, without violation of the Amendment.

We have jurisdiction on appeal from the judgments on the third count, as there was drawn in question the validity of a state statute under the Federal Constitution, and the decision was in favor of validity. Since the conviction on the fifth count was not based upon a statute, but presents a substantial question under the Federal Constitution, we granted the writ of certiorari in respect of it.

The facts adduced to sustain the convictions on the third count follow. On the day of their arrest the appellants were engaged in going singly from house to house on Cassius Street in New Haven. They were individually equipped with a bag containing books and pamphlets on religious subjects, a portable phonograph and a set of records, each of which, when played, introduced, and was a description of, one of the books. Each appellant asked the person who responded to his call for permission to play one of the records. If permission was granted he asked the person to buy the book described and, upon refusal, he solicited such contribution towards the publication of the pamphlets as the listener was willing to make. If a contribution was received a pamphlet was delivered upon condition that it would be read.

Cassius Street is in a thickly populated neighborhood, where about ninety per cent of the residents are Roman Catholics. A phonograph record, describing a book entitled "Enemies," included an attack on the Catholic religion. None of the persons interviewed were members of Jehovah's Witnesses.

The statute under which the appellants were charged provides:

"No person shall solicit money, services, subscriptions or any valuable thing for any alleged religious, charitable

or philanthropic cause, from other than a member of the organization for whose benefit such person is soliciting or within the county in which such person or organization is located unless such cause shall have been approved by the secretary of the public welfare council. Upon application of any person in behalf of such cause, the secretary shall determine whether such cause is a religious one or is a bona fide object of charity or philanthropy and conforms to reasonable standards of efficiency and integrity, and, if he shall so find, shall approve the same and issue to the authority in charge a certificate to that effect. Such certificate may be revoked at any time. Any person violating any provision of this section shall be fined not more than one hundred dollars or imprisoned not more than thirty days or both."

The appellants claimed that their activities were not within the statute but consisted only of distribution of books, pamphlets, and periodicals. The State Supreme Court construed the finding of the trial court to be that "in addition to the sale of the books and the distribution of the pamphlets the defendants were also soliciting contributions or donations of money for an alleged religious cause, and thereby came within the purview of the statute." It overruled the contention that the Act, as applied to the appellants, offends the due process clause of the Fourteenth Amendment, because it abridges or denies religious freedom and liberty of speech and press. The court stated that it was the solicitation that brought the appellants within the sweep of the Act and not their other activities in the dissemination of literature. It declared the legislation constitutional as an effort by the State to protect the public against fraud and imposition in the solicitation of funds for what purported to be religious, charitable, or philanthropic causes.

The facts which were held to support the conviction of Jesse Cantwell on the fifth count were that he stopped

two men in the street, asked, and received, permission to play a phonograph record, and played the record "Enemies," which attacked the religion and church of the two men, who were Catholics. Both were incensed by the contents of the record and were tempted to strike Cantwell unless he went away. On being told to be on his way he left their presence. There was no evidence that he was personally offensive or entered into any argument with those he interviewed.

The court held that the charge was not assault or breach of the peace or threats on Cantwell's part, but invoking or inciting others to breach of the peace, and that the facts supported the conviction of that offense.

*First.* We hold that the statute, as construed and applied to the appellants, deprives them of their liberty without due process of law in contravention of the Fourteenth Amendment. The fundamental concept of liberty embodied in that Amendment embraces the liberties guaranteed by the First Amendment.[3] The First Amendment declares that Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof. The Fourteenth Amendment has rendered the legislatures of the states as incompetent as Congress to enact such laws. The constitutional inhibition of legislation on the subject of religion has a double aspect. On the one hand, it forestalls compulsion by law of the acceptance of any creed or the practice of any form of worship. Freedom of conscience and freedom to adhere to such religious organization or form of worship as the individual may choose cannot be restricted by law. On the other hand, it safeguards the free exercise of the chosen form of religion. Thus the Amendment embraces two concepts,—freedom to believe and freedom to act. The first is absolute but, in the nature of things, the

---

[3] *Schneider* v. *State,* 308 U. S. 147, 160.

second cannot be. Conduct remains subject to regulation for the protection of society.[4] The freedom to act must have appropriate definition to preserve the enforcement of that protection. In every case the power to regulate must be so exercised as not, in attaining a permissible end, unduly to infringe the protected freedom. No one would contest the proposition that a State may not, by statute, wholly deny the right to preach or to disseminate religious views. Plainly such a previous and absolute restraint would violate the terms of the guarantee.[5] It is equally clear that a State may by general and non-discriminatory legislation regulate the times, the places, and the manner of soliciting upon its streets, and of holding meetings thereon; and may in other respects safeguard the peace, good order and comfort of the community, without unconstitutionally invading the liberties protected by the Fourteenth Amendment. The appellants are right in their insistence that the Act in question is not such a regulation. If a certificate is procured, solicitation is permitted without restraint but, in the absence of a certificate, solicitation is altogether prohibited.

The appellants urge that to require them to obtain a certificate as a condition of soliciting support for their views amounts to a prior restraint on the exercise of their religion within the meaning of the Constitution. The State insists that the Act, as construed by the Supreme Court of Connecticut, imposes no previous restraint upon the dissemination of religious views or teaching but merely safeguards against the perpetration of frauds under the cloak of religion. Conceding that this is so, the question remains whether the method adopted by Connecticut to

[4] *Reynolds* v. *United States*, 98 U. S. 145; *Davis* v. *Beason*, 133 U. S. 333.

[5] Compare *Near* v. *Minnesota*, 283 U. S. 697, 713.

that end transgresses the liberty safeguarded by the Constitution.

The general regulation, in the public interest, of solicitation, which does not involve any religious test and does not unreasonably obstruct or delay the collection of funds, is not open to any constitutional objection, even though the collection be for a religious purpose. Such regulation would not constitute a prohibited previous restraint on the free exercise of religion or interpose an inadmissible obstacle to its exercise.

It will be noted, however, that the Act requires an application to the secretary of the public welfare council of the State; that he is empowered to determine whether the cause is a religious one, and that the issue of a certificate depends upon his affirmative action. If he finds that the cause is not that of religion, to solicit for it becomes a crime. He is not to issue a certificate as a matter of course. His decision to issue or refuse it involves appraisal of facts, the exercise of judgment, and the formation of an opinion. He is authorized to withhold his approval if he determines that the cause is not a religious one. Such a censorship of religion as the means of determining its right to survive is a denial of liberty protected by the First Amendment and included in the liberty which is within the protection of the Fourteenth.

The State asserts that if the licensing officer acts arbitrarily, capriciously, or corruptly, his action is subject to judicial correction. Counsel refer to the rule prevailing in Connecticut that the decision of a commission or an administrative official will be reviewed upon a claim that "it works material damage to individual or corporate rights, or invades or threatens such rights, or is so unreasonable as to justify judicial intervention, or is not consonant with justice, or that a legal duty has not

306

been performed." [6]  It is suggested that the statute is to be read as requiring the officer to issue a certificate unless the cause in question is clearly not a religious one; and that if he violates his duty his action will be corrected by a court.

To this suggestion there are several sufficient answers. The line between a discretionary and a ministerial act is not always easy to mark and the statute has not been construed by the state court to impose a mere ministerial duty on the secretary of the welfare council. Upon his decision as to the nature of the cause, the right to solicit depends. Moreover, the availability of a judicial remedy for abuses in the system of licensing still leaves that system one of previous restraint which, in the field of free speech and press, we have held inadmissible. A statute authorizing previous restraint upon the exercise of the guaranteed freedom by judicial decision after trial is as obnoxious to the Constitution as one providing for like restraint by administrative action.[7]

Nothing we have said is intended even remotely to imply that, under the cloak of religion, persons may, with impunity, commit frauds upon the public. Certainly penal laws are available to punish such conduct. Even the exercise of religion may be at some slight inconvenience in order that the State may protect its citizens from injury. Without doubt a State may protect its citizens from fraudulent solicitation by requiring a stranger in the community, before permitting him publicly to solicit funds for any purpose, to establish his identity and his authority to act for the cause which he purports to represent.[8]  The State is likewise free to regulate the time

[6] *Woodmont Assn.* v. *Milford,* 85 Conn. 517, 522; 84 A. 307, 310; see also *Connecticut Co.* v. *Norwalk,* 89 Conn. 528, 531; 94 A. 992.

[7] *Near* v. *Minnesota,* 283 U. S. 697.

[8] Compare *Lewis Publishing Co.* v. *Morgan,* 229 U. S. 288, 306–310; *New York ex rel. Bryant* v. *Zimmerman,* 278 U. S. 63, 72.

and manner of solicitation generally, in the interest of public safety, peace, comfort or convenience. But to condition the solicitation of aid for the perpetuation of religious views or systems upon a license, the grant of which rests in the exercise of a determination by state authority as to what is a religious cause, is to lay a forbidden burden upon the exercise of liberty protected by the Constitution.

*Second.* We hold that, in the circumstances disclosed, the conviction of Jesse Cantwell on the fifth count must be set aside. Decision as to the lawfulness of the conviction demands the weighing of two conflicting interests. The fundamental law declares the interest of the United States that the free exercise of religion be not prohibited and that freedom to communicate information and opinion be not abridged. The State of Connecticut has an obvious interest in the preservation and protection of peace and good order within her borders. We must determine whether the alleged protection of the State's interest, means to which end would, in the absence of limitation by the Federal Constitution, lie wholly within the State's discretion, has been pressed, in this instance, to a point where it has come into fatal collision with the overriding interest protected by the federal compact.

Conviction on the fifth count was not pursuant to a statute evincing a legislative judgment that street discussion of religious affairs, because of its tendency to provoke disorder, should be regulated, or a judgment that the playing of a phonograph on the streets should in the interest of comfort or privacy be limited or prevented. Violation of an Act exhibiting such a legislative judgment and narrowly drawn to prevent the supposed evil, would pose a question differing from that we must here answer.[9] Such a declaration of the State's policy

---

[9] Compare *Gitlow* v. *New York*, 268 U. S. 652, 670–1; *Thornhill* v. *Alabama, ante,* pp. 98–105.

would weigh heavily in any challenge of the law as infringing constitutional limitations. Here, however, the judgment is based on a common law concept of the most general and undefined nature. The court below has held that the petitioner's conduct constituted the commission of an offense under the state law, and we accept its decision as binding upon us to that extent.

The offense known as breach of the peace embraces a great variety of conduct destroying or menacing public order and tranquility. It includes not only violent acts but acts and words likely to produce violence in others. No one would have the hardihood to suggest that the principle of freedom of speech sanctions incitement to riot or that religious liberty connotes the privilege to exhort others to physical attack upon those belonging to another sect. When clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order, appears, the power of the State to prevent or punish is obvious. Equally obvious is it that a State may not unduly suppress free communication of views, religious or other, under the guise of conserving desirable conditions. Here we have a situation analogous to a conviction under a statute sweeping in a great variety of conduct under a general and indefinite characterization, and leaving to the executive and judicial branches too wide a discretion in its application.

Having these considerations in mind, we note that Jesse Cantwell, on April 26, 1938, was upon a public street, where he had a right to be, and where he had a right peacefully to impart his views to others. There is no showing that his deportment was noisy, truculent, overbearing or offensive. He requested of two pedestrians permission to play to them a phonograph record. The permission was granted. It is not claimed that he

intended to insult or affront the hearers by playing the record. It is plain that he wished only to interest them in his propaganda. The sound of the phonograph is not shown to have disturbed residents of the street, to have drawn a crowd, or to have impeded traffic. Thus far he had invaded no right or interest of the public or of the men accosted.

The record played by Cantwell embodies a general attack on all organized religious systems as instruments of Satan and injurious to man; it then singles out the Roman Catholic Church for strictures couched in terms which naturally would offend not only persons of that persuasion, but all others who respect the honestly held religious faith of their fellows. The hearers were in fact highly offended. One of them said he felt like hitting Cantwell and the other that he was tempted to throw Cantwell off the street. The one who testified he felt like hitting Cantwell said, in answer to the question "Did you do anything else or have any other reaction?" "No, sir, because he said he would take the victrola and he went." The other witness testified that he told Cantwell he had better get off the street before something happened to him and that was the end of the matter as Cantwell picked up his books and walked up the street.

Cantwell's conduct, in the view of the court below, considered apart from the effect of his communication upon his hearers, did not amount to a breach of the peace. One may, however, be guilty of the offense if he commit acts or make statements likely to provoke violence and disturbance of good order, even though no such eventuality be intended. Decisions to this effect are many, but examination discloses that, in practically all, the provocative language which was held to amount to a breach of the peace consisted of profane, indecent, or abusive remarks directed to the person of the hearer. Resort to epithets or

personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution, and its punishment as a criminal act would raise no question under that instrument.

We find in the instant case no assault or threatening of bodily harm, no truculent bearing, no intentional discourtesy, no personal abuse. On the contrary, we find only an effort to persuade a willing listener to buy a book or to contribute money in the interest of what Cantwell, however misguided others may think him, conceived to be true religion.

In the realm of religious faith, and in that of political belief, sharp differences arise. In both fields the tenets of one man may seem the rankest error to his neighbor. To persuade others to his own point of view, the pleader, as we know, at times, resorts to exaggeration, to vilification of men who have been, or are, prominent in church or state, and even to false statement. But the people of this nation have ordained in the light of history, that, in spite of the probability of excesses and abuses, these liberties are, in the long view, essential to enlightened opinion and right conduct on the part of the citizens of a democracy.

The essential characteristic of these liberties is, that under their shield many types of life, character, opinion and belief can develop unmolested and unobstructed. Nowhere is this shield more necessary than in our own country for a people composed of many races and of many creeds. There are limits to the exercise of these liberties. The danger in these times from the coercive activities of those who in the delusion of racial or religious conceit would incite violence and breaches of the peace in order to deprive others of their equal right to the exercise of their liberties, is emphasized by events familiar to all. These and other transgressions of those limits the States appropriately may punish.

Although the contents of the record not unnaturally aroused animosity, we think that, in the absence of a statute narrowly drawn to define and punish specific conduct as constituting a clear and present danger to a substantial interest of the State, the petitioner's communication, considered in the light of the constitutional guarantees, raised no such clear and present menace to public peace and order as to render him liable to conviction of the common law offense in question.[10]

The judgment affirming the convictions on the third and fifth counts is reversed and the cause is remanded for further proceedings not inconsistent with this opinion.

*Reversed.*

---

[10] Compare *Schenck* v. *United States,* 249 U. S. 47, 52; *Herndon* v. *Lowry,* 301 U. S. 242, 256; *Thornhill* v. *Alabama, ante,* p. 88.