[Crim. No. 535.    Fourth Appellate District.—October 28, 1940.]

THE PEOPLE, Respondent, v. LESTER A. NORTHUM et al., Appellants.

Earl F. Crandell for Appellants.

A. L. Wirin, as *Amicus Curiae,* on Behalf of Appellants.

Earl Warren, Attorney-General, Frank Richards, Deputy Attorney-General, and Roger Walch, District Attorney, for Respondent.

BARNARD, P. J.—The defendants were charged with conspiracy to commit the crime of disturbing the peace in that they "did conspire, combine, confederate and agree together to maliciously and wilfully disturb the peace and quiet of persons and/or neighborhoods in the City of Hanford, County of Kings, State of California, by tumultuous and/or offensive conduct". A jury found them guilty, and they have appealed from the judgment and from an order denying a new trial.

The appellants were all members of "Jehovah's Witnesses" and, as such, were engaged in the practice of going from door to door preaching their beliefs by word of mouth, by the use of phonograph records and by distributing literature. On June 6, 1940, the district attorney, having received complaints that members of this organization were going from door to door in the City of Hanford, summoned the appellant Northum to his office. Northum's attention was called to riots which had occurred in other communities which had resented the doctrines preached by this organization, he was told that with the rising patriotic fervor in that community it was not a wise time to be preaching such doctrines, and he was asked to cooperate by desisting therefrom for the time being. Northum refused this request and the next day he was ar-

rested on a charge of disturbing the peace. He was released on bail the next day and the following day, June 9, some 150 members of Jehovah's Witnesses, most of whom were from an adjoining county, "invaded" the residential districts of Hanford. A large number of telephone calls were received at the sheriff's office and by various officials of the city, complaining that these people were going from house to house, and one group of five citizens demanded of a police officer that some action be taken in connection therewith. As a result, the district attorney sent officers out to contact the offending persons and request them to cease their operations. These requests being ignored or refused, three of the appellants were arrested and charged with disturbing the peace. These three appellants called the appellant Northum on the telephone and shortly thereafter the appellant Feaster appeared on the scene. Northum and Feaster had not previously been in Hanford on that day. Two of the appellants informed the officers that whenever the people of a community interfered with their members it was the policy of this organization to send a large group into the territory and work it in the way in which they had worked that day. Thereupon, a complaint was issued charging all five of the appellants with conspiring to disturb the peace.

The appellants contend that the evidence is insufficient to support the verdict and judgment, that there is no evidence of any unlawful acts, or of any conspiracy to do unlawful acts, upon their part, and that the effect of the judgment is to deprive them of their constitutional rights of free speech and freedom in the exercise of their religious beliefs. The respondent admits that there was, in the trial of this case, "no issue of religious persecution, nor was the question as to whether or not the members of Jehovah's Witnesses should salute the American flag involved".

While there is evidence that a large number of persons had telephoned to various officers complaining of the fact that members of the group to which the appellants belonged were going about from house to house, there is no evidence that any of the persons so telephoning complained of any specific act on the part of any of the appellants or claimed that any unlawful act had been committed in his presence by any one of the appellants or of the group to which they belonged. There is no evidence of any act of discourtesy on the part

of any of the group toward any citizen of Hanford and no evidence of any disturbance, either public or private. The nearest approach to any evidence of any conflict or controversy between any persons is the testimony of one man to the effect that one of the appellants came to his house, rapped on the door, and came in and asked if she could play a record, that he told her he was not interested and she asked him if he would read some of her literature, and that he and his wife and another man who was present all repeatedly refused this request. The only reasonable inference is that she entered the house with permission, and he testified that the conversation did not become heated and that "after I abruptly told her to go, in plain words, she did". There is no evidence that any of the appellants attempted to hold a meeting or that they carried on any of their activities on the public streets or in any public place, the only activities complained of being at private homes. There is no evidence that any attempt was made to play a phonograph record or to carry on any extended conversation unless the individual in question was admitted to a private house, and no evidence of any refusal to leave upon being requested so to do.

The respondent, in effect, concedes that no one of the appellants committed any act which was in itself unlawful or which was, of itself, offensive. This fact is important, since the appellants were charged with conspiring to disturb the peace by "tumultuous and/or offensive conduct". The respondent's sole contention is that, while preaching from door to door by any single one of the appellants under the circumstances shown by the evidence would not constitute a disturbance of the peace, an entirely different situation is presented here "when there exists a conspiracy of a large number of these individuals to deliberately invade a community at a time when the patriotic fervor of the people is running high, and to do it for retaliation against the local civil authorities, knowing full well that by so doing they are making themselves offensive and arousing the anger of the people to the point that might well result in violence".

■ In the sense material here, a conspiracy exists when two or more persons conspire to commit a criminal offense. (Pen. Code, sec. 182.) ■ Under these circumstances, it is difficult to see how a criminal conspiracy can be said to have existed when the carrying out of the agreed purpose has

involved the doing of no act which is, in itself, unlawful. If, as conceded, the acts of the individual appellants were not in themselves unlawful they can hardly be held to have been guilty of a conspiracy in planning and agreeing upon the performance of those acts. If we concede that the presence of a large number of these individuals in this community was arranged through a spirit of retaliation against the local authorities, this would not constitute a criminal conspiracy if no overt acts were performed which were unlawful. The contention seems to be that the mere presence of this group of people, although they did nothing unlawful, might arouse the anger of the citizens and result in violence. In other words, we are asked to assume that the performance of lawful acts on the part of the appellants might arouse the people of the community to the point where they would engage in unlawful acts against the appellants.

In *Cantwell* v. *State of Connecticut*, 310 U. S. 296 [60 Sup. Ct. 900, 84 L. Ed. 1213, 128 A. L. R. 1352], a somewhat similar case in which, however, the element of conspiracy was lacking, the court said:

"The offense known as breach of the peace embraces a great variety of conduct destroying or menacing public order and tranquility. It includes not only violent acts but acts and words likely to produce violence in others. No one would have the hardihood to suggest that the principle of freedom of speech sanctions incitement to riot or that religious liberty connotes the privilege to exhort others to physical attack upon those belonging to another sect. When clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order, appears, the power of the state to prevent or punish is obvious. Equally obvious is it that a state may not unduly suppress free communication of views, religious or other, under the guise of conserving desirable conditions. . . .

"One may, however, be guilty of the offense if he commit acts or make statements likely to provoke violence and disturbance of good order, even though no such eventuality be intended. Decisions to this effect are many, but examination discloses that, in practically all, the provocative language which was held to amount to a breach of the peace consisted of profane, indecent, or abusive remarks directed to the person of the hearer. . . .

"We find in the instant case no assault or threatening of bodily harm, no truculent bearing, no intentional discourtesy, no personal abuse. On the contrary, we find only an effort to persuade a willing listener to buy a book or to contribute money in the interest of what Cantwell, however misguided others may think him, conceived to be true religion."

█ In the instant case, if the appellants were acting within their rights in their individual conduct and if the individual members of this organization were not disturbing the peace by pursuing their activities, there is no evidence which would support the conspiracy charge merely because, by arrangement, a larger number of persons were, on this occasion, engaged in these activities. There is no evidence of the use of profane, indecent or abusive remarks directed to other persons or of any acts or statements which, in themselves, would be likely to provoke violence or a disturbance of the peace. While a large number of the members of this organization engaged in these activities in this community on that day, we find no evidence that they congregated in one place or engaged in any demonstration which would naturally be expected to lead to a disturbance. The only evidence is that they went to individual homes, either singly or possibly in some instances with two going together, and there is no evidence that they forced their attentions or conversation upon any person who was unwilling to listen. In our opinion, the evidence is not sufficient to sustain the verdict or judgment.

It is in times of stress that problems with respect to the exercise of the right of free speech and the exercise of religious freedom more commonly arise. Unfortunately, at such times both interference with these rights, on the one hand, and the abuse of these privileges on the other, are apt to occur. █ As a general rule, the right of free speech is subject to the exception that it shall not be so exercised as to interfere with the rights of others. When such interference exists, it cannot be doubted that such rights of others may be protected under our laws and Constitutions. But no such a situation is presented in this case where, so far as shown by the evidence, the appellants talked only to willing listeners who admitted them to their homes and where they desisted and left upon the request of the occupants. █ In one sense it is more or less of a nuisance for a householder to have

to answer the doorbell in response to the ring of one who wants to present either physical or mental wares in which he is not interested. But this in itself is not a nuisance in the legal sense, especially where it is not repeated. There is no evidence that any of the appellants went twice to the same home or in any other respect committed a nuisance, under our general laws. So far as appears from the evidence, any citizen in this community who objected to the teachings of this group had ample protection for himself and his family by refusing to admit them to their homes.

The judgment and order appealed from are reversed.

Marks, J., and Griffin, J., concurred.