(No. 42273.—

The City of Chicago, Appellee, *vs.* Susan Wender *et al.,*
Appellants.

*Opinion filed June 29, 1970.—Rehearing denied October 6, 1970.*

Underwood, C.J., and Culbertson, J., dissenting.

Thomas Grippando, of Chicago, for appellants.

Raymond F. Simon, Corporation Counsel, of Chicago,
(Marvin E. Aspen, Assistant Corporation Counsel, of
counsel,) for appellee.

Mr. Justice Crebs delivered the opinion of the court:

On August 27, 1968, the defendants, Susan Wender,
Deborah Drysdale, Peter Leeds, Roger Keenan, Christopher
Elms, and Donald Buck, were arrested and charged with
disorderly conduct in violation of section 193—1(b) of the
Municipal Code of the City of Chicago. They waived a trial
by jury and after a bench trial before a magistrate of the

circuit court of Cook County they were found guilty. Fines that ranged from $25 to $100 were imposed on each of them. On this direct appeal they contend that their constitutional rights were violated in several respects.

At approximately 1:00 A.M. on August 27, 1968, the morning after the opening day of the Democratic National Convention in Chicago, the six defendants and two other female companions were traveling north on Michigan Avenue in the City of Chicago in a station wagon owned and operated by the defendant Donald Buck. Officers James Nolan, James Hayes, and Edward Clancy of the Chicago Police Department stopped the car at 831 South Michigan Avenue, one block south of the Conrad Hilton Hotel, because it had no rear license plate.

Officer Nolan approached the car, informed the driver of the violation, and asked to see his driver's license. Buck stepped out of the car and produced a valid Connecticut operator's license, but because an out-of-state license could not be used in lieu of a cash bond, Officer Nolan informed him that he would have to go to the First District Police Headquarters at 11th and State Streets to post a $25 cash bond. (Ill. Rev. Stat. 1967, ch. 95½, par. 6A-306.) Officer Nolan testified that in addition to the six defendants there were also present in the car "two girls who have been dismissed at a previous trial."

Officer Nolan testified that Donald Buck "informed the occupants of his vehicle that 'These Cops are going to take us to the station. We have to post a cash bond.' Well, the occupants started to get out of the vehicle, and formed in a small group on the east side of Michigan right next to their vehicle. They were on the sidewalk. The car was parked at the curb. There was no other means of transportation, so, for our own safety, knowing we would have to bring them in to the district we padded [*sic*] each and every individual witness   *   *   *." Officer Nolan then

identified the defendants and stated that there were thirty or forty people walking about in the immediate area. His direct examination continued:

"Q. Did these people, as you were talking to the occupants of the car, did these people gather around the car?

A. The defendants kept wanting to know, yelling, 'What right do you have to search us? What are we arrested for?' The people around started to take notice of what was going on.

Q. Now, in what manner were the occupants of the car speaking to you, were they quietly saying this?

A. No, no, no, they were loud.

Q. Loud?

A. Yes.

Q. How far would you estimate the voices would be heard?

A. A hundred feet.

Q. What were they saying, Officer?

A. They wanted to, demanded to know what right we had to stop their vehicle, why they had to go to the station to post a cash bond, why they were being padded down, and what right we had to do it.

Q. Did you explain all of this to them?

A. Yes.

Q. Did they stop at this, or, did they continue?

A. No, then, they wanted our name and star numbers, which we said we would give them as soon as we got in the station.

Q. This was all being made in a loud tone of voice?

A. The traffic started to slow down to see what was going on, people were looking our way. That is when we decided it would be better to take everybody in to the station and informed the people they were under arrest for disorderly conduct, informed them of their rights, rather, than after the confrontation. [*sic*]"

Officer Nolan also testified that there were two busloads of police officers across the street from where the defendants' car was stopped and that eight of those officers came across the street. On rebuttal Officer Clancy testified that at the time there were between 500 and 1000 people in front of the Conrad Hilton Hotel, a block away from the scene of the arrest. He was asked, "Q. Did you see any of those people come over to where you were?", and he answered, "yes." This was all of the evidence offered by the prosecution.

Ordinarily an arrest for a minor traffic offense does not justify a search for weapons. The situation at the time of this occurrence was unusual and we do not hold that the search was unreasonable under all the circumstances. Still the fact that the search occurred is a circumstance to be considered.

Looking only at the testimony for the prosecution, there was not, in our opinion, sufficient evidence to establish that the defendants were guilty of disorderly conduct. Section 193—1(b) of the Municipal Code of the City of Chicago provides: "A person commits disorderly conduct when he knowingly: * * * does or makes any unreasonable or offensive act, utterance, gesture, or display, which, under the circumstances, creates a clear and present danger of a breach of peace or imminent threat of violence; * * *." The question in this case is whether the evidence shows that the defendants did an "unreasonable act" which created "a clear and present danger of a breach of peace or imminent threat of violence."

The offense of disorderly conduct "embraces a great variety of conduct destroying or menacing public order and tranquility. It includes not only violent acts but acts and words likely to produce violence in others." (*Cantwell* v. *Connecticut,* 310 U.S. 296, 308, 84 L. Ed. 1213, 1220, 60 S. Ct. 900; see *United States* v. *Woodard* (7th cir. 1967), 376 F.2d 136, 141.) The creation and maintenance

of loud and raucous noises has always been thought to be within the common-law definition, but it is not the decibel level of the utterance or the type of conduct alone that is determinative. The Committee Comments to section 26—1(a), which we upheld against constitutional attack in *People* v. *Raby*, 40 Ill.2d 392, recognize that "culpability is equally dependent upon the surrounding circumstances. * * * Thus, running through a hallway shouting 'fire!' may amount to conduct which tends to alarm others, but if a fire in fact exists, such conduct may be justified, *i.e.*, it may not be unreasonable. What is reasonable must always depend upon the particular case and therefore must be left to determination on the facts and circumstances of each situation as it arises." (See also *United States* v. *Woodard* (7th cir. 1967), 376 F.2d 136, 141; *Landry* v. *Daley* (N.D. Ill. 1968), 288 F. Supp. 189, 193.) In section 193—1(b) of the Chicago Municipal Code, as in the closely analogous section 26—1(a) of the State Criminal Code, the concept of justification is encompassed in the word "unreasonable". See *People* v. *Raby*, 40 Ill.2d 392, 395; *cf.* Model Penal Code Section 250.1, Comment (Tent. Draft No. 13, 1961).

Although Officer Nolan characterized the voices of the defendants as "loud" his estimate was that their voices carried "a hundred feet". Even in response to the prosecution's leading question as to whether the 30 or 40 people who were walking in the immediate area gathered around the car, the officer stated only that "the people around started to take notice of what was going on." He also testified that "the traffic started to slow down to see what was going on, people were looking our way." But no arrest and "padding down" of eight persons, male and female, by three police officers, can be expected to go unnoticed, regardless of the conduct of the arrested persons. Officer Clancy was asked in rebuttal whether he saw "any of the people from in front of the Conrad Hilton come over to where you were." He answered, "Yes," but how many persons

came to the scene, and whether or not they were walking in that direction before the car in which the defendants were riding was stopped does not appear.

The driver of the car had committed a traffic offense. The conduct of the officers in frisking all the occupants of the car, even if justified by the circumstances, was unusual and could reasonably have caused the defendants to inquire as to the authority of the officers and as to their identity, while their tone was "loud", the inference from the testimony is that they did not continue to ask why they were arrested after an explanation was given but then asked for names and star numbers which had not been given them.

The judgment of the circuit court of Cook County is reversed.

*Judgment reversed.*

Mr. CHIEF JUSTICE UNDERWOOD, dissenting:

I am in complete agreement that the determining factors in this case, under the terms of the ordinance, are the reasonableness of the conduct of the defendants and whether a clear and present danger of a breach of the peace was created. I cannot agree with the Court's conclusion that defendants' conduct, in the context in which it occurred, was not disorderly.

It is beyond dispute that the atmosphere on Michigan Avenue in Chicago at the point and time of defendants' arrest was one of considerable tension. One of the officers testified that the volume of defendants' shouting and screaming was such that it carried for hundreds of feet. There were 500 to 1000 people gathered a block away, and some of them, as a result of the clamor, were beginning to come over to the scene of the arrest. Thirty to forty people gathered in the immediate area, and vehicular traffic was slowing down. Even one of the defendants, who all attempted to portray the scene that night as one of urban tranquility, explained his anxiety at the scene of the arrest

as due to "the amount of tension on Michigan Avenue that night." In my opinion the conduct of defendants in these circumstances was sufficient to sustain the conviction.

The implied suggestion by the Court that the "frisking" or "padding" of defendants was provocation for their conduct, is in my opinion, unsupportable. Even assuming the search unwarranted, a position with which I do not agree, the yelling, shouting reaction of defendants was, in my opinion, not justifiable.

I would affirm.

Mr. JUSTICE CULBERTSON joins in this dissent.