996 A.2d 805 (2010)
In re T.L., Appellant.
No. 06-FS-798.
District of Columbia Court of Appeals.
Argued April 9, 2009.
Decided June 3, 2010.
*807 Christopher Kemmitt, Public Defender Service, with whom James Klein and Samia Fam, Public Defender Service, were on the brief, for appellant.
Mary L. Wilson, Senior Assistant Attorney General, with whom Peter J. Nickles, Attorney General for the District of Columbia, Todd S. Kim, Solicitor General, and Rosalyn Calbert Groce, Deputy Solicitor General, were on the brief, for the District of Columbia.
*808 Before REID, GLICKMAN, and FISHER, Associate Judges.
GLICKMAN, Associate Judge:
T.L. appeals his juvenile delinquency adjudication for disorderly conduct and for possessing cocaine with the intent to distribute it. His claims require us to construe the term "breach of the peace" in the District's disorderly conduct statute, D.C.Code § 22-1321 (2001). Sixteen-year-old T.L. was arrested for loudly yelling in protest and calling for his mother, on the street in a residential neighborhood in the middle of the night, after a police officer confiscated his money without permission or right. We hold that T.L.'s loud words, though they may have annoyed or disturbed nearby residents, did not threaten a breach of the peace or manifest an intent on T.L.'s part to provoke one. The police therefore lacked probable cause to arrest T.L. for disorderly conduct, and the trial court should have granted his motion to suppress the drugs discovered on his person in a search incident to his arrest. And because the evidence at trial did not suffice to prove disorderly conduct, the court should have acquitted him of that charge. Accordingly, we reverse T.L.'s juvenile delinquency adjudication on both counts.

I.
On the night of December 22, 2005, at about 11:50 p.m., Officer Robert Elliott was on uniform patrol in the vicinity of the Sursum Corda housing cooperative, a densely populated residential area known to him for high drug activity and gun violence. While driving down the 1100 block of 1st Place, N.W., Elliott noticed a group of men standing on the corner. T.L. was in that group. Elliott recognized several of the other men there and knew they had prior drug-trafficking arrests. The location, Elliott testified in the hearing below, was "notorious" for drive-by shootings and drug dealing.
As the officer passed by, T.L. saw him and called out, "Hey Elliott, what's up?" Elliott stopped, got out of his car, and approached T.L. At that time, the other people on the corner walked away, leaving the officer alone with T.L., who did not attempt to leave. Elliott asked T.L. whether he lived there, and T.L. said he did not. Elliott then asked him, "You got any drugs or guns on [you]?" T.L. replied, "Yo, Officer Elliott, you know me. I ain't got no drugs or guns.... Go ahead and search me." According to Elliott, T.L. was friendly and cooperative.[1]
Accepting T.L.'s invitation, Elliott started to search him. Almost immediately, the officer removed two large "wads" of cash from T.L.'s coat and pants pockets. Elliott told T.L. he was seizing the money because "it was in a high-drug trafficking area and it was a large amount of currency to have on your person."[2] Elliott said he would place the cash "on the book" at the police station and T.L. "possibly" could get it back if he could produce a pay stub.
At this point, Elliott testified, T.L.'s "demeanor completely changed." He began yelling, "They're taking my money. I work at McDonald's. I got that money working at McDonald's," and loudly calling for his mother to come help him. In response to the clamor, some ten to fifteen *809 people left their town houses and approached T.L. and Elliott to see what was happening.
T.L. did not call upon the onlookers to intervene, and none of them tried to do so. Elliott considered it "very dangerous" to attract a crowd, however, "especially in Sursum Corda." He explained in his testimony that suspects sometimes incite crowds to divert and overwhelm the police in order to escape. Elliott stopped searching T.L. and told him three or four times to "quit yelling" and "relax" because it was late at night and people were trying to sleep. A second officer in the vicinity, Officer Johnson, heard the noise, stopped what he was doing, and ran over to assist Elliott.
Ignoring Elliott's entreaties to be quiet, T.L. continued yelling that the money was his, he worked at McDonald's, and he wanted his mother. Elliott then placed T.L. under arrest for disorderly conduct. At the hearing below, Elliott explained that he based the arrest on T.L.'s non-compliance with his requests to be quiet, the time of night, and the number of people who were attracted by the commotion. In a search of T.L.'s person following his arrest, Officer Johnson recovered 24 zip-lock bags of crack cocaine hidden in T.L.'s pants.
T.L. was charged by petition with disorderly conduct, in violation of D.C.Code § 22-1321(3), and possession of cocaine with intent to distribute, in violation of D.C.Code § 48-904.01(a). Prior to trial, he moved to suppress the cocaine on several grounds, among them that the police lacked probable cause to arrest him.[3] The trial court denied the motion, reasoning that T.L.'s protestations furnished probable cause to arrest him for disorderly conduct because he "just continued to scream and shout and began drawing a crowd of people to come out from the neighborhood."
At the conclusion of his trial, T.L. moved for a judgment of acquittal on the disorderly conduct charge on the ground that he did not incite the crowd of onlookers or threaten to occasion a breach of the peace. The prosecutor countered that T.L. violated subsection (3) of D.C.Code § 22-1321 by making a loud disturbance during the nighttime hours that drew people out of their homes. Agreeing with the government, the trial court found T.L. guilty on both counts of the petition. With respect to the disorderly conduct charge, the court said it found the evidence sufficient based on Officer Elliott's testimony "that people were coming out of their homes and congregating around," and on his "genuine concern ... that this would, in fact, escalate into a situation that could cause serious threats to public safety, to his safety, and even to the safety of T.[L.] himself."

II.
The disorderly conduct statute at issue in this appeal, D.C.Code § 22-1321, reads in its entirety as follows:
Whoever, with intent to provoke a breach of the peace, or under circumstances such that a breach of the peace may be occasioned thereby: (1) acts in *810 such a manner as to annoy, disturb, interfere with, obstruct, or be offensive to others; (2) congregates with others on a public street and refuses to move on when ordered by the police; (3) shouts or makes a noise either outside or inside a building during the nighttime to the annoyance or disturbance of any considerable number of persons; (4) interferes with any person in any place by jostling against such person or unnecessarily crowding such person or by placing a hand in the proximity of such person's pocketbook, or handbag; or (5) causes a disturbance in any streetcar, railroad car, omnibus, or other public conveyance, by running through it, climbing through windows or upon the seats, or otherwise annoying passengers or employees, shall be fined not more than $250 or imprisoned not more than 90 days, or both.
This is the first prosecution under subsection (3) of the statute that has come to our attention. Regardless of the subsection allegedly violated, however, the introductory "breach of the peace" clause qualifies it and sets forth an essential element of the offense; namely, that the defendant act with intent to provoke a breach of the peace or under circumstances such that one may occur. Thus, contrary to the District's position in the trial court, it is not necessarily enough to prove a subsection (3) violation merely to establish that the defendant made a racket in the nighttime that disturbed the neighbors. And though the terms of subsection (3) pose their own interpretive issues, we find it unnecessary to discuss them, for this appeal turns on the scope of the "breach of the peace" clausea question of statutory construction as to which our review is de novo.[4]
T.L. argues that the "breach of the peace" element requires a showing that his purely verbal conduct posed a danger of triggering violence on the part of the crowd that gathered in response to his protestations. Because the crowd was peaceful and he did not urge it to interfere, T.L. contends there was neither probable cause to arrest him for disorderly conduct nor sufficient evidence to find him guilty of that offense. According to T.L., "Section 22-1321(3) does not criminalize shouts and loud noises; it criminalizes only those shouts and loud noises that are likely to cause an outbreak of violence."[5]
The government disagrees. It argues that loud and persistent yelling in the middle of the night may so disturb the public tranquility that it amounts to a breach of the peace even absent the danger that violence will erupt.[6] The government further argues that even if T.L.'s behavior did not constitute disorderly conduct, Officer Elliott's mistake of law in thinking otherwise was reasonable in the circumstances and therefore should not result in exclusion of the cocaine found on T.L. in the search incident to his arrest.
In a series of recent cases factually comparable to this one (though they were *811 brought under subsection (1) of the disorderly conduct statute[7]), we have considered whether and when obstreperous speech may constitute disorderly conduct. In those cases we have reiterated that "[o]ne circumstance where a breach of the peace may be occasioned is where the defendant uses words likely to produce violence on the part of others."[8] Furthermore, we have held, "the bare possibility that words directed to a police officer may provoke violence by others does not suffice to show disorderly conduct; rather the words must create a likelihood or probability of such reaction."[9] And we have rejected a proposed alternative test under which language could be found to threaten a breach of the peace absent a danger of violence if "it is, under contemporary community standards, so grossly offensive to members of the public who actually overhear it as to amount to a nuisance."[10] In "pure `words' cases," we have concluded, this test for breach of the peace based on nuisance without threat of violence does not pass muster under the First Amendment; rather, "for punishment as disorderly conduct, all such words `by their very utterance,' must `inflict injury' or, at the very least, `tend to incite an immediate breach of the peace,' meaning a `hostile reaction' by one or more third parties (other than police officers) to whom the words were directed."[11]
In the present case, though T.L. loudly protested Officer Elliott's seizure of his money (and called upon his mother for help), he did not urge the onlookers to intervene on his behalf or otherwise manifest an intent to provoke them to violence. And while T.L.'s yelling may have annoyed the neighbors who were attracted to the commotion, there is no evidence they were hostile or likely to become violent. "The fact that, as Officer [Elliott] testified, he nonetheless feared a hostile reaction in a neighborhood he did not consider police-friendly cannot substitute for this deficiency in actual proof of words likely, in the circumstances, to provoke a violent reaction by others."[12] It is true that a police officer who has objective reason to believe that violence is imminent "need not stand by and await" its outbreak "before he attempts to control the situation with a disorderly *812 conduct arrest."[13] But our past cases make clear that Officer Elliott lacked sufficient cause to believe, and the trial court lacked sufficient evidence to find, that an outbreak of violence was likely or that T.L. was trying to incite it.[14]
However, we have not held that the only circumstance in which a breach of the peace may be occasioned by speech is where the speech is likely to trigger violence. This is the first case in which we have considered whether a disorderly conduct charge may be predicated on speech that is offensive by virtue of its excessive loudness under the particular circumstances. Our opinion in Martinez v. District of Columbia[15] cannot be read as having rejected, on First Amendment grounds, a "nuisance" test that is based on the time, place, and manner of speech rather than its content. T.L.'s verbal protest of Officer Elliott's conduct was, undoubtedly, speech that came within the protection of the First Amendment.[16] But "even in a public forum" such as a public street, the First Amendment allows the government to "impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information."[17] Noise regulationparticularly noise regulation designed to protect the peace of persons in their homesis compatible with the First Amendment if it satisfies the foregoing requirements, even when the noise is made by what otherwise would be protected expression. The "government has a substantial interest in protecting its citizens from unwelcome noise," an interest that "is perhaps at its greatest when government seeks to protect the well-being, tranquility, and privacy of the home."[18] In accordance *813 with the foregoing principles, courts in other jurisdictions have upheld the constitutionality of penalizing otherwise protected speech under disorderly conduct laws when the speech is "so unreasonably loud as to unreasonably intrude on the privacy of a captive audience,"[19] or so "loud and continued" as to "offend[ ] a reasonable person of common sensibilities and disrupt[ ] the reasonable conduct of basic nighttime activities such as sleep."[20]
Thus, it is open for us to consider whether a "breach of the peace" within the meaning of D.C.Code § 22-1321 may be occasioned by speech that is unreasonably loud and disruptive. We think that under the historical meaning of the common-law term, it may. While "the first breach of the peace offenses were concerned with fighting and rioting,"[21] the scope of the offense broadened over time to "embrace[ ] a great variety of conduct destroying or menacing public order and tranquility."[22] A leading treatise on criminal law describes the offense as follows:
At common law, any act which disturbs or tends to disturb the public peace is a misdemeanor. By "peace" is meant the tranquility enjoyed by citizens of a community where good order reigns among its members, this being the natural right of all persons in political society.[[23]]
Consequently, the production of excessive noise may be prohibited as a breach of the peace, not only "because of the danger that someone whose tranquility is unreasonably disturbed may decide to physically render the disturber unnoisy," but also "because of the public interest in tranquility" itself.[24] Indeed, perhaps reflecting a growing trend to elevate the importance of peace and quiet, an authoritative modern legal dictionary currently defines "breach of the peace" as "[t]he criminal offense of creating a public disturbance or engaging in disorderly conduct, particularly by making an unnecessary or distracting noise."[25] And courts in other jurisdictions *814 have held that unreasonably loud yelling may amount to a breach of the peace.[26]
We thus reject T.L.'s contention that D.C.Code § 22-1321(3) "criminalizes only those shouts and loud noises that are likely to cause an outbreak of violence." The conduct at which subsection (3) most obviously is directeddisturbing people in their homes by making a racket in the middle of the nightis, seemingly, a paradigmatic example of the sort of conduct that permissibly is proscribed as a breach of the peace even if it is not "likely" to trigger an outbreak of violence. The prohibition is concerned not with the content of the speech, but with its objectively unreasonable volume under the circumstances. Accordingly, for example, we assume that "the person who screams his political beliefs in the corridor of an apartment building at three a.m.,"[27] or on a residential street in the middle of the night, may be punished under subsection (3) for disturbing the peace, without a showing that violence erupted or was likely to erupt.
In thus construing the term "breach of the peace" consistently with the First Amendment, we stress the government's burden of showing that the noise was unreasonably loud under the circumstances. It is not always unreasonable or offensive to scream and wake up the neighbors. Indeed, sometimes it is desirable to do so. "[R]unning through a hallway shouting `fire!' may amount to conduct which tends to alarm others, but if a fire in fact exists, such conduct may be justified, i.e., it may not be unreasonable."[28] Similarly, yelling loudly for help or screaming in fear or outrage when one is being (or has just been) robbed, assaulted or otherwise abused on a residential street in the middle of the night may not be unreasonable either, though it may disturb and annoy the nearby citizens asleep in their beds. In emergencies or extenuating circumstances, yelling at the top of one's lungs to rouse the surrounding populace and obtain relief would not amount to a breach of the peace as we understand that term. When circumstances warrant sounding the alarm or crying for succor, D.C.Code § 22-1321 cannot reasonably be interpreted to penalize such emergency communications.[29]

III.
Even assuming that T.L.'s loud protestations and calls for his mother's help "during the nighttime" annoyed or disturbed a "considerable number of persons" within the meaning of D.C.Code § 22-1321(3), we cannot agree that the noise T.L. made was so unreasonable as to constitute or threaten a breach of the peace under the unusual extenuating circumstances present in this case.
*815 We cannot overlook the fact that Officer Elliott had no right to take T.L.'s money when he did. T.L. may have consented to be searched, but he did not consent to the warrantless seizure of the cash he was carrying in his pockets. It may have been a large sum for T.L. to be carrying in a "high-drug trafficking area," as Officer Elliott claimed. But "[c]ircumstances other than the nature of the neighborhood must form the basis of a reasonable suspicion that criminal activity was afoot,"[30] and even taking into account the area's reputation, T.L.'s mere possession of cash, "even a lot of it," did not give the officer probable cause to seize it (or to arrest T.L.).[31] Thus, T.L. had good reason to protest Officer Elliott's action.[32]
By misinforming T.L. that he would have to prove his legitimate entitlement to the money, and suggesting that T.L.'s chances of getting the money back were uncertain even if he showed the police his pay stub, Officer Elliott only exacerbated the situation. T.L.'s aggrieved and vehement response to the officer's provocation was entirely foreseeable. From his perspective, T.L. was confronted with "an unexpected development urgently requiring a prompt response"or in other words, an emergency[33]when Officer Elliott unlawfully confiscated his money and led him to believe he would have a hard time recovering it. Because it was a police officer whose wrongful action created the emergency in the first place, it is understandable that T.L. did not appeal to the other officers in the vicinity to assist him. The futility of such an appeal is indicated by the fact that Officer Johnson, who heard T.L.'s protests and came running, supported his fellow officer. We cannot fault a sixteen-year-old in these circumstances for loudly objecting and calling for his mother to come and stand up for his rights before the police departed with his money. As discussed above, that is all T.L. didhe did not incite the onlookers to violence or threaten to become violent himself. Although T.L. did not obey Officer Elliott's request to be quiet, the officer never offered to satisfy T.L. by returning his money. And T.L.'s yelling lasted only a few minutes before he was arrested; it was not unduly prolonged.
We hold that T.L.'s loud but peaceful protestations and calls for his mother's help in reaction to Officer Elliott's *816 unjustified seizure of his money were a response to an emergency situation and were not unreasonable under the circumstances. They therefore did not amount to, or threaten to occasion, a breach of the peace, nor did they manifest an intent on T.L.'s part to provoke such a breach. Accordingly, though T.L.'s shouts occurred in the nighttime and may have awakened and annoyed nearby residents, he did not violate D.C.Code § 22-1321.[34] The trial court should have acquitted him of that charge.

IV.
"For an arrest to be lawful, the Fourth Amendment requires that it be supported by probable cause."[35] "The classic formulation is that probable cause exists where the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed."[36] Because Officer Elliott knew, or should have known, that T.L. was merely protesting the unlawful seizure of his money and calling for help, the officer lacked probable cause to arrest T.L. for disorderly conduct.
The drugs supporting the charge of possession with intent to distribute cocaine were discovered in a search of T.L.'s person pursuant to his illegal arrest. "Evidence discovered as the result of an illegal seizure generally must be suppressed as `fruit of the poisonous tree.'"[37] The government resists application of the exclusionary rule here, however. At the time of T.L.'s arrest, it argues, "reasonable jurists" could have disagreed with our holding that the disorderly conduct statute does not proscribe the behavior of T.L. in this case. The deterrence purpose of the exclusionary rule would not be served, the government concludes, by suppressing the evidence discovered as a result of Officer Elliott's mistaken but reasonable understanding of the law.
We disagree. Unlike an objectively reasonable mistake of fact (which we do not have in this case), an officer's mistake of law, however reasonable, "cannot provide the objective basis for reasonable suspicion or probable cause" needed to justify a search or seizure.[38] And

*817 there is no good-faith exception to the exclusionary rule for police who do not act in accordance with governing law. To create [such] an exception ... would defeat the purpose of the exclusionary rule, for it would remove the incentive for police to make certain that they properly understand the law that they are entrusted to enforce and obey.[39]
Thus, "[t]he justifications for the good-faith exception [to the exclusionary rule] do not extend to situations in which police officers have interpreted ambiguous precedent or relied on their own extrapolations from existing caselaw."[40] "When law enforcement officers rely on precedent to resolve legal questions as to which `[r]easonable minds ... may differ,' the exclusionary rule is well-tailored to hold them accountable for their mistakes."[41]
Accordingly, we hold that the trial court should have granted T.L.'s motion to suppress the drugs seized from his person.

V.
For the foregoing reasons, we reverse T.L.'s delinquency adjudication on both counts of the petition against him and remand for further proceedings consistent with this opinion. A judgment of acquittal must be entered with respect to the disorderly conduct charge. Theoretically, the government is at liberty to retry T.L. on the drug possession charge, but it will have to do so without using the cocaine seized from his person in violation of his Fourth Amendment rights.
NOTES
[1] We recite the material facts as the trial court found them, and in the light most favorable to sustaining the trial court's rulings. See Robinson v. United States, 928 A.2d 717, 728 (D.C.2007); Peay v. United States, 597 A.2d 1318, 1320 (D.C.1991) (en banc). The trial court discredited T.L.'s testimony that Elliott searched him without his consent.
[2] The police subsequently determined that T.L. was carrying a total of $974.
[3] T.L. also alleged that he was illegally seized in his initial encounter with Officer Elliott and that he did not consent to be searched. The trial court rejected both of those claims. On appeal, T.L. does not challenge the court's finding that "the entire encounter up until and through the discovery of the money was entirely consensual on the part of T.L." For its part, the government does not contend (nor do we suppose) that T.L.'s initial consent supplied an alternative justification for the search following his disorderly conduct arrest, or that Officer Elliott inevitably would have discovered the cocaine hidden on T.L.'s person even if he had not arrested T.L.
[4] District of Columbia v. Jerry M., 717 A.2d 866, 868 (D.C.1998).
[5] Brief for Appellant at 12.
[6] The government also suggests that T.L. committed a breach of the peace by inducing Officer Johnson to stop what he was doing (speaking to some other persons down the block) and thereby interfering with the officer's performance of his duties. We reject this suggestion, which finds no meaningful support in our case law. A prohibition of "speech that `in any manner ... interrupt[s]' an officer" in the performance of his duties is overbroad; "[t]he Constitution does not allow such speech to be made a crime." City of Houston v. Hill, 482 U.S. 451, 462, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987).
[7] In pertinent part, D.C.Code § 22-1321 states that "[w]hoever, with intent to provoke a breach of the peace, or under circumstances such that a breach of the peace may be occasioned thereby: (1) acts in such a manner as to annoy, disturb, interfere with, obstruct, or be offensive to others," commits the offense of disorderly conduct.
[8] In re W.H.L., 743 A.2d 1226, 1228 (D.C. 2000); see also Martinez v. District of Columbia, 987 A.2d 1199, 1202 (D.C.2010); Shepherd v. District of Columbia, 929 A.2d 417, 418 (D.C.2007).
[9] Shepherd, 929 A.2d at 419. "[T]he focus ordinarily must be on the likelihood of a violent reaction by persons other than a police officer to whom the words were directed, because a police officer is expected to have a greater tolerance for verbal assaults and is especially trained to resist provocation by verbal abuse that might provoke or offend the ordinary citizen." Id. (internal quotation marks and brackets omitted).
[10] Martinez, 987 A.2d at 1203 (quoting Williams v. District of Columbia, 136 U.S.App. D.C. 56, 64, 419 F.2d 638, 646 (1969) (en banc) (internal quotation marks omitted)).
[11] Id. at 1204 (quoting Chaplinsky v. New Hampshire, 315 U.S. 568, 572, 62 S.Ct. 766, 86 L.Ed. 1031 (1942), and Cohen v. California, 403 U.S. 15, 20, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971)) (internal citation and footnote omitted). See also Gooding v. Wilson, 405 U.S. 518, 524, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972).
[12] Shepherd, 929 A.2d at 419-420.
[13] Gueory v. District of Columbia, 408 A.2d 967, 970 (D.C.1979).
[14] See Martinez, 987 A.2d at 1202 (overturning disorderly conduct conviction of driver who directed a stream of profane abuse at the police officer who stopped her; though it attracted the attention of passersby, it did not threaten to cause an outbreak of violence); Shepherd, 929 A.2d at 419-420 (reversing disorderly conduct conviction of subway rider who screamed and cursed at the WMATA police officer issuing him a citation for failing to pay the fare, where the rider did not provoke the crowd that gathered to observe the incident); W.H.L., 743 A.2d at 1229 (holding that juvenile's loud, profanity-laced protest against police officer's attempted seizure of his bicycle did not threaten to incite a breach of the peace, where the juvenile "was not attempting to entice the crowd to act against the police").
[15] Supra note 8, 987 A.2d at 1203-04.
[16] Cf. Norwell v. City of Cincinnati, 414 U.S. 14, 16, 94 S.Ct. 187, 38 L.Ed.2d 170 (1973) (overturning disorderly conduct conviction for pedestrian's "loud and boisterous" response to police officer's attempt to stop him; "petitioner was arrested and convicted merely because he verbally and negatively protested Officer Johnson's treatment of him. Surely, one is not to be punished for nonprovocatively voicing his objection to what he obviously felt was a highly questionable detention by a police officer."); see also City of Houston v. Hill, 482 U.S. 451, 462-63, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987) ("The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state.").
[17] Ward v. Rock Against Racism, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) (internal quotation marks omitted).
[18] Id. at 796, 109 S.Ct. 2746 (internal quotation marks, brackets and citations omitted). See, e.g., Frisby v. Schultz, 487 U.S. 474, 484-485, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988) (upholding ordinance prohibiting residential picketing).
[19] Eanes v. State, 318 Md. 436, 569 A.2d 604, 616 (1990) (affirming conviction of abortion protester for "wilfully disturb[ing] any neighborhood... by loud and unseemly noises"); see also id. at 617 (citing cases from other jurisdictions). By the term "captive audience," the Eanes court meant unwilling listeners, such as persons in their homes or offices, "who cannot readily escape from the undesired communication, or whose own rights are such that [they] should not be required to do so." Id. at 611.
[20] City of Marietta v. Grams, 40 Ohio App.3d 139, 531 N.E.2d 1331, 1336 (1987) (upholding conviction for excessively loud residential partying in violation of ordinance making it a misdemeanor to "disturb the good order and quiet of the Municipality by clamors or noises in the night season").
[21] Robert Force, Decriminalization of Breach of the Peace Statutes: A Nonpenal Approach to Order Maintenance, 46 TUL. L.REV. 367, 369 (1972).
[22] District of Columbia v. Jordan, 232 A.2d 298, 299 (D.C. 1967) (quoting Cantwell v. Connecticut, 310 U.S. 296, 308, 60 S.Ct. 900, 84 L.Ed. 1213 (1940)) (holding that the "activities of a peeping Tom would certainly constitute a menace to the tranquility of a neighborhood" and hence could be prosecuted as disorderly conduct).
[23] 4 Charles E. Torcia, Wharton's Criminal Law § 502 (15th ed. 1996) (footnotes omitted).
[24] Force, supra note 21, at 369. See also City of Chicago v. Wender, 46 Ill.2d 20, 262 N.E.2d 470, 472 (1970) ("The creation and maintenance of loud and raucous noises has always been thought to be within the common-law definition, but it is not the decibel level of the utterance or the type of conduct alone that is determinative.").
[25] BLACK'S LAW DICTIONARY 214 (9th ed. 2009) (emphasis added).
[26] See, e.g., People v. Albert, 243 Ill.App.3d 23, 183 Ill.Dec. 304, 611 N.E.2d 567, 570 (1993) (affirming disorderly conduct conviction where defendant, by yelling and screaming at 2:00 a.m. on a residential street, "did not cause mere annoyance or curiosity among the public, but forcibly disturbed the peace and quiet of people asleep in their homes"); Polk v. State, 378 Md. 1, 835 A.2d 575 (2003) (affirming conviction of hospital visitor whose prolonged and unreasonable screaming created a public disturbance).
[27] MODEL PENAL CODE § 250.2 cmt. 4(d) at 346 (1980) (Section 250.2 provides in pertinent part that "[a] person is guilty of disorderly conduct if, with purpose to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he ... makes unreasonable noise....").
[28] Wender, 262 N.E.2d at 472.
[29] Of course, prolonging the hue and cry after it is no longer justified might not be reasonable and hence could breach the peace.
[30] In re T.T.C., 583 A.2d 986, 990 (D.C.1990).
[31] See United States v. $506,231 in U.S. Currency, 125 F.3d 442, 452 (7th Cir.1997) ("The existence of any sum of money, standing alone, is not enough to establish probable cause to believe the money is forfeitable. As far as we can tell, no court in the nation has yet held that, standing alone, the mere existence of currency, even a lot of it, is illegal. We are certainly not willing to be the first to so hold.") (citations omitted); see also, e.g., United States v. Baro, 15 F.3d 563, 568 (6th Cir.1994) ("To date, this Court has not held that currency is contraband."); United States v. $30,000 in U.S. Currency, 30 Fed.Appx. 473, 482-83 (6th Cir.2002) (finding no probable cause for seizure of $4,600 when appellant was returning from a known drug trafficking city). Cf. Ball v. United States, 803 A.2d 971, 980 (D.C.2002) ("Standing alone, the plain view of a simply suspicious-looking or unusual object which itself is not contraband, does not justify its seizure without a warrant.") (internal quotation marks omitted). (We discuss the requirements of probable cause in more detail below.)
[32] Cf. Wender, 262 N.E.2d at 473 (holding that vehicle occupants could not be convicted of disorderly conduct for loudly protesting "unusual" police decision to frisk them during a 1:00 a.m. traffic stop, "even if" the searches were "justified by the circumstances").
[33] Nat'l Ass'n of Postmasters of the U.S. v. Hyatt Regency Washington, 894 A.2d 471, 476 (D.C.2006) (citing dictionary definitions of "emergency").
[34] Obviously, our holding is a narrow one that reflects the peculiar extenuating circumstances of this case; our tolerance of a teenage boy's loud protestations and calls for his mother in response to a police officer's mistreatment certainly does not remove all noisy and annoying nighttime protests against law enforcement from the purview of D.C.Code § 22-1321(3). Whether the production of noise is unreasonable always depends on the particular circumstances in which it occurs.
[35] Perkins v. United States, 936 A.2d 303, 305 (D.C.2007). "Whether the police had probable cause on a given set of historical facts is a question of law subject to de novo review on appeal." Id. (citing Ornelas v. United States, 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996)).
[36] Id. at 306 (internal brackets, quotation marks, and citations omitted).
[37] Patton v. United States, 633 A.2d 800, 816 (D.C. 1993) (citing Wong Sun v. United States, 371 U.S. 471, 484-86, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)).
[38] United States v. Chanthasouxat, 342 F.3d 1271, 1280 (11th Cir.2003). Accord, United States v. Coplin, 463 F.3d 96, 101 (1st Cir. 2006) ("Stops premised on a mistake of law, even a reasonable, good-faith mistake, are generally held to be unconstitutional."); United States v. McDonald, 453 F.3d 958, 961-962 (7th Cir.2006) ("We agree with the majority of circuits to have considered the issue that a police officer's mistake of law cannot support probable cause.... It makes no difference that an officer holds an understandable or `good faith' belief that a law has been broken.... A stop based on a subjective belief that a law has been broken, when no violation actually occurred, is not objectively reasonable."); United States v. Tibbetts, 396 F.3d 1132, 1138 (10th Cir.2005) ("[F]ailure to understand the law by the very person charged with enforcing it is not objectively reasonable.").
[39] Chanthasouxat, 342 F.3d at 1280 (quoting United States v. Lopez-Soto, 205 F.3d 1101, 1106 (9th Cir.2000)). The Eleventh Circuit also "note[d] the fundamental unfairness of holding citizens to `the traditional rule that ignorance of the law is no excuse,' while allowing those `entrusted to enforce' the law to be ignorant of it." Id. (citation omitted).
[40] United States v. Davis, 598 F.3d 1259, 1267 (11th Cir.2010).
[41] Id. (internal citation and footnote omitted). We hasten to add that this is not a case of objectively reasonable reliance by law enforcement on binding judicial precedent that was subsequently overruled. We express no view as to whether the exclusionary rule should be applied in such circumstances. Cf. United States v. Debruhl, 993 A.2d 571 (D.C. 2010).