CUDAHY JUNIOR CHAMBER OF COMMERCE, Respondent, v. QUIRK, a/k/a THE GREATER MILWAUKEE COMMITTEE AGAINST FLUORIDATION, Appellant.*

*No. 172.  Argued February 6, 1969.—Decided March 4, 1969.*
(Also reported in 165 N. W. 2d 116.)

* Motion for rehearing denied, with costs, on May 6, 1969.

For the appellant there were briefs and oral argument by *James Quirk* of Cudahy, *pro se.*

For the respondent there was a brief by *Boren & Schmidt* and *Morton J. Schmidt,* all of Cudahy, and oral argument by *Morton J. Schmidt.*

ROBERT W. HANSEN, J.   This case revolves around a question and answer that headed up a two-page brochure that James Quirk distributed in Cudahy, urging a "No" vote in the April, 1966, election on the question of whether the public water supply should be fluoridated. Here's the question and here's the answer:

"(Q) Is it true, as Dr. Chelius has once again told the people of Cudahy that 'A person would have to drink the equivalent of fifty bathtubs of water at once to get a harmful dose of fluoride?'

"(A) So preposterous is this statement that we shall give $1,000 to the Jay Cees for fluoridation promotion if a daily dose of four glasses cannot cause 'dermatologic, gastrointestinal and neurological disorders.' If the Jay Cees should find that we have misrepresented matters in this paper, we will then also pay the sum of $1,000."

*What have we here?*

In the eyes of the law, exactly what is this sort of challenge made in the heat of an election campaign? Was it an offer that, upon acceptance, became a binding contract? Was it a reward, analogous to the sums of money offered for information leading to the arrest and conviction of the perpetrator of a crime? Was it a bet, a wagering of $1,000 against the possibility that one might be wrong?

In 2 Restatement, *Contracts,* pp. 1007, 1008, sec. 520, comment *c,* the following is stated: "A wager may relate to a trial of skill, or to *proof of an actual fact* or even to a certain event that happened in the past." (Emphasis supplied.) The Restatement gives this example of a wager:

"A promises B one hundred dollars if B can give ocular demonstration of the rotundity of the earth, to the satisfaction of C; in consideration of which B promises to pay a similar amount if he fails. B, by sights established over a large lake, satisfies C. A does not believe when he enters into the transaction that B can make the proof. B knows he can. Though the condition is not fortuitous, the transaction is a wager."

The only difference between the example given and the case before us is that the Jaycees were not required to risk their $1,000 or any other amount of money to accept the bet or take up the challenge. It can be contended that the time, effort and expense involved in seeking to prove the defendant wrong supply the element of

consideration, a something lost if the effort to prove the defendant wrong should fail. This would make the accepted challenge a contract, but would not change the nature of such contract. It would remain a wager, unenforceable as against public policy. In essence the Quirk challenge was a wager—"I'll gamble my $1,000 against your efforts to prove me wrong that my statements are correct." It is not close kin to a bet that the Green Bay Packers will best the Chicago Bears in their next gridiron encounter. It is, however, a twin to the bet that Babe Ruth once pitched for the Boston Red Sox. It is the essential nature of a transaction, rather than the label attached to it by the parties, that determines whether it is in truth and fact a wager. *See* 38 Am. Jur. 2d, *Gambling*, pp. 242, 243, sec. 189.

*Who won the bet?*

The jury's finding, which was sustained by the trial court, was that the Jaycees won the wager. This amounted to an acceptance of the credibility of the testimony offered by the Jaycees that Quirk had "misrepresented matters" in his brochure. We do not reach the issue of fact as to who won and who lost the wager. Our holding is that the participants in a wager may not use the court to settle their dispute because gambling debts cannot be established or collected in the courts.

*The question of public policy?*

In addition to the judicial reluctance to hold the stakes or decide the winner in a betting situation, there are sound reasons of public policy for not having court or jury decide whose gloved fist is to be lifted in victory in this dispute. It is clear that, while $1,000 would be a welcome addition to club coffers, the primary concern of the Jaycees is to vindicate the rightness of their position that fluoridation of the Cudahy water supply involves no harmful side effects. It is at least as clear that James Quirk's principal interest is in seeking court con-

firmation of his contention that fluoridation of a community's drinking water risks harmful consequences. He appeared as his own counsel, and his brief and oral argument dealt only with the rightness of his antifluoridation stance. In fact, in rejecting the demand for payment of the Jaycees, he wrote, with copies to local press, "Top promoters of fluoridation will turn aghast at airing the harm and stupidity of fluoridation in open court. We welcome the opportunity of a court hearing." The time-honored explanation, "It isn't the money. It's the principle of the thing" describes both the intensity of conviction and explains the gap between the points of view of the parties to this action.

If disputants on the issue of the harmful effects of fluoridation can by the process of challenge and acceptance bring their dispute on this issue of public concern to the courts for adjudication, the list of matters in which litigants could seek determinations by the court of questions of public policy would be a long one. Dedicated crusaders for varying points of view, pro and con, by the process of challenge and response, could have courts rule on whether birth control pills have harmful side-effects, whether cigarettes cause cancer, whether sugar substitutes alter chromosomes. If there are ways of bringing such controversies to court, putting up $1,000 to be paid to anyone who can prove you wrong does not make the courts the forum or the referee. Here the true controversy is as to the effects of fluoridation. We have grave doubts as to whether this is a justiciable issue—one appropriate for judicial inquiry. *See Baker v. Carr* (1962), 369 U. S. 186, 82 Sup. Ct. 691, 7 L. Ed. 2d 663.

*The issue of public debate.*

It is to be remembered that the brochure in which the claimed misrepresentation was printed was a part of the public debate of a public issue in a public referendum. It is pertinent that ". . . more than 900 refer-

enda on fluoridation have been held in the United States since 1950. . . Probably no issue of science and public policy has involved as much emotional fervor as fluoridation of public drinking water." (From Saturday Review March 1, 1969, p. 56.) This case must be considered against the background of what has been termed ". . . a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co. v. Sullivan* (1964), 376 U. S. 254, 84 Sup. Ct. 710, 11 L. Ed. 2d 686. In that case, the nation's highest tribunal conceded "That erroneous statement is inevitable in free debate . . ." but asserted that the constitutional protection does not turn upon ". . . 'the truth, popularity, or social utility of the ideas and beliefs which are offered,' " citing an earlier case where the court had said:

"In the realm of religious faith, and in that of political belief, sharp differences arise. In both fields the tenets of one man may seem the rankest error to his neighbor. To persuade others to his own point of view, the pleader, as we know, at times, resorts to exaggeration, to vilification of men who have been, or are, prominent in church or state, and even to false statement. But the people of this nation have ordained in the light of history, that, in spite of the probability of excesses and abuses, these liberties are, in the long view, essential to enlightened opinion and right conduct on the part of the citizens of a democracy." *Cantwell v. Connecticut* (1940), 310 U. S. 296, 310, 60 Sup. Ct. 900, 84 L. Ed. 1213.

While there may be situations in which the courts are required to intervene, as in cases of libel or slander, it is clear that there is a wide latitude constitutionally assured to participants in the political process of persuading an electorate to vote, "Yes," or, "No," in a referendum election. It includes the right to be wrong, as one side almost always is in a debate of a public issue.

It is understandable that the Jaycees, a civic organization of young men with an established record for effective participation in civic enterprises, would want to have

its presentation of facts found to be accurate, and that of its principal adversary found to be false, misleading and misrepresented. It is not the role or function of the judicial branch of our government to make that determination. Some may see it as a weakness but it is the heart of the referendum law and the democratic process that, in this situation, the voters, not judge or jury, are to bring in the verdict. We can with propriety commend all individuals and all groups who participate in securing the expressed will of an informed electorate, but it is not for us to determine whose presentation had either the greatest accuracy or greatest persuasiveness. The cases, affirmative and negative, were submitted to the jury at the polls. They were not for a jury in a courtroom to affirm or reverse.

The what, why, when and where of this case require that the judgment be reversed and the case dismissed.

*By the Court.*—Judgment reversed, and cause remanded with directions to dismiss the complaint.