# CIRCUIT COURT OF THE CITY OF RICHMOND

Sonya Knipe Roberts

v.

Jeffrey Scott Roberts

April 15, 2002

Case No. HI-471-4

BY JUDGE RANDALL G. JOHNSON

This ended divorce action was reinstated on Ms. Roberts' petition to reverse joint custody and/or modify visitation between Dr. Roberts and the parties' two children, Nash, age 12, and Hannah, age 10. The petition also sought attorney's fees. After the order of reinstatement was entered, Ms. Roberts filed an additional motion titled "Motion To Suspend or Modify Visitation," but which actually asked the court to suspend Dr. Roberts' visitation, to grant sole legal custody of the children to her, and to award her spousal support, an increase in child support, reimbursement for life insurance premiums required to be paid by Dr. Roberts, and attorney's fees and costs. Also after the case was reinstated, Dr. Roberts filed a motion for modification of child support, a motion for a rule to show cause, and a motion for attorney's fees and costs. The show cause motion asked that Ms. Roberts be held in contempt for unilaterally and without court order denying visitation ordered by the court and for making disparaging remarks about Dr. Roberts in the presence of the children. An evidentiary hearing was held on April 5. Based on the evidence and arguments presented, the court will grant Ms. Roberts' motion to award her sole legal custody of the children. The court will also terminate Dr. Roberts' visitation. Both parties' requests for a modification of child support and for attorney's fees and costs will be denied, as will Ms.

Roberts' request for spousal support. Dr. Roberts' motion to hold Ms. Roberts in contempt will also be denied.

To fully appreciate the issues involved, the history of the case must be set out. This action was initially filed by Ms. Roberts on April 3, 1997.[1] In a *pendente lite* order entered on October 21, 1997, temporary custody of the children was awarded to Ms. Roberts. Dr. Roberts was given visitation every weekend, as well as some overnight visitation during the week. The order provided that "[i]t is the court's intention to give [Dr. Roberts] as much visitation as possible." The order also required Dr. Roberts to pay spousal support of $2,100 and child support of $2,400, those amounts apparently being agreed to by the parties. The court says this because, according to the court's handwritten note on the file jacket, the court indicated after the ore tenus hearing on *pendente lite* relief that it would order Dr. Roberts to pay $4,500 per month as combined child and spousal support during the pendency of the case. In the sketch which became the *pendente lite* order, however, and which was prepared by Ms. Robert's counsel and endorsed as "Seen" by counsel for Dr. Roberts, it is provided that Dr. Roberts would pay spousal support of $2,100 and that the resulting monthly incomes of the parties — Dr. Roberts' monthly income was $31,900 after payment of spousal support while Ms. Roberts' monthly income consisted solely of spousal support — resulted in a child support amount of $2,400 under the child support guidelines set out in Va. Code § 20-108.2(B).

On November 21, 1997, the parties entered into a separation agreement. The agreement provided for joint custody of the children with Ms. Roberts having physical custody Sunday evening through Friday afternoon of each week and Dr. Roberts having physical custody from Friday afternoon through Sunday evening plus an additional three hours one evening per week. Holidays were evenly divided and Dr. Roberts was also to have the children for an additional five weeks per year. The parties further agreed that Dr. Roberts would pay $4,500 per month as combined child and spousal support, which was the same as the total support ordered by the court. Paragraph 17(B) of the agreement stated: "The parties recognize that the presumptive child support guidelines of Virginia Code § 20-108.2(B) have not been adhered to in negotiating support."

---

[1] When suit was filed and until the filing of the present motion for reinstatement, Ms. Roberts' counsel of record was different from her present counsel. Dr. Roberts was also represented by counsel other than his present counsel, and, for a brief period, represented himself, until the early part of 2001.

A final decree of divorce was entered on June 24, 1998. Jurisdiction was retained "for the purpose of determining issues related to property, support, custody, visitation, and counsel fees." The separation agreement is not mentioned in the final decree.

On July 28, 1998, Dr. Roberts filed a petition for support modification, asking the court to reduce his spousal and child support payments due to a change in circumstances. The petition alleged that Dr. Roberts had changed jobs and that his income had been drastically reduced so that he could no longer make the $4,500 monthly payments previously ordered and agreed to. On August 10, 1998, Ms. Roberts filed a petition for an increase in support, modification of visitation, order restricting travel, and order compelling proof of life insurance, Dr. Roberts having agreed in the separation agreement to maintain a $1,000,000 policy on his life with the children as beneficiaries. Among the allegations contained in Ms. Roberts' petition was the following:

[Dr. Roberts] believes and has told the children that because their mother has different spiritual beliefs from him, she is of the devil and is destined to go to hell unless she becomes what he deems a "Born Again Christian" like him.

After an ore tenus hearing, the court entered an order on December 17, 1998, denying each party's motion for a modification of child and spousal support, but granting Ms. Roberts' motion for a modification of visitation. Specifically, Dr. Roberts' visitation was reduced from every weekend to every other weekend. Otherwise, it remained pretty much as it was, although Dr. Roberts was given greater visitation during the summer. The order also removed the case from the court's docket.

On April 1, 1999, Dr. Roberts filed a petition for modification of child support, spousal support, and visitation. Although he did not include in his petition a request that the action be reinstated on the court's active docket, that omission was cured on April 7, 1999, when Ms. Roberts filed a motion for reinstatement on the same issues. The action was reinstated by order entered April 13, 1999. A hearing was held on May 4, 1999. At the hearing, counsel for the parties announced that the parties had reached agreement on all issues except Dr. Roberts' request for modification of visitation. After hearing evidence and argument, the court denied his request. The sketch of an order prepared by counsel for Ms. Roberts and again endorsed by Dr. Roberts' counsel as "Seen," contained the following language, with "Plaintiff" referring to Ms. Roberts and "Defendant" referring to Dr. Roberts:

[B]ased upon the agreement of the parties, it is hereby ordered that commencing September 1, 1999, or upon the first day of the month following the closing on the sale of the former marital home owned by the Plaintiff, the Defendant shall pay to the Plaintiff as child support the sum of $3,000 per month payable on or before the first day of each month thereafter until further Order of the court. The parties agree and stipulate that this child support amount is not based upon the applicable guidelines, and the application of those guidelines would therefore not be a change in circumstances.

Further, the parties have stipulated that this adjustment in the support payments takes into account the fact that the defendant is newly employed in a medical practice in Asheville, North Carolina, with an annual salary of ONE HUNDRED EIGHTY THOUSAND AND 00/100 DOLLARS ($180,000.00), that the Plaintiff is newly employed by the Richmond City Public Schools at an annual salary of TWENTY-TWO THOUSAND FIVE HUNDRED EIGHTY-SIX AND 00/100 DOLLARS ($22,586.00), and that the plaintiff will receive proceeds from the sale of her home from which she could earn an income that would be includable for the purpose of determining the child support obligation which is agreed upon herein.

It [is] further ordered that commencing September 1, 1999, or upon the first day of the month following the closing on the sale of the former marital home owned by the Plaintiff, the Defendant shall be relieved of his obligation to pay spousal support to the plaintiff. However, the Plaintiff's entitlement to spousal support in the future based upon a change of circumstances is expressly reserved.

The sketch also made some minor changes concerning the times the parties were to pick up and deliver the children for visitation, again "based upon the agreement of the parties." The sketch, which retained the case on the docket, was entered as an order on July 21, 1999.

On September 14, 2000, Ms. Roberts filed another petition for modification of visitation. The petition stated that after Dr. Roberts moved to Asheville, North Carolina, which he had done prior to entry of the July 1999 order, he purchased a house in Charlottesville, Virginia, for the express purpose of facilitating his visitation with the children. This was so because Ms. Roberts had planned on moving to Charlottesville, something that was also noted in the July 1999 order. She did not move. Her petition stated that Dr. Roberts was planning to marry a woman who lived in Asheville and had sold his Charlottesville house. This meant that the alternating weekend

visitation required the children to travel between Richmond and Asheville instead of between Richmond and Charlottesville. The petition also contained the following allegation:

> [C]ontrary to the best interests of the children and in a demonstration in poor judgment and parenting skills, the Defendant has instructed the children that they are to call their new step-mother "Mother," that they will be spanked when they do not, and that they will be asked to go to Court to tell the judge that they want to be with their father, and that if they fail to do so, it would be a sin against God because it is his turn to have their custody and to have them live with him and his new wife and her children in Asheville, North Carolina.

Ms. Roberts asked that the court limit visitation to the immediate Richmond area, or that Dr. Roberts provide transportation to and from Asheville other than by automobile, or that visitation be altered. She also asked that Dr. Roberts be ordered to "refrain from proselytizing the children and telling them they will have to come to Court." A hearing was set for November 15, 2000.

At the beginning of the November 15 hearing, the parties informed the court that they were trying to reach agreement on all outstanding issues and asked for additional time to do so. After some additional time, they informed the court that a hearing was not necessary and that they would submit a sketch of an appropriate order. Instead of receiving a sketch, however, the court received letters from Ms. Roberts, from Ms. Roberts' counsel, and from Dr. Roberts, who was now representing himself. The letters set out the parties' positions on each of the issues in dispute. In response, the court wrote a letter dated December 20, 2000, in which the court said:

> It appears the only matter about which the parties disagree is whether Ms. Roberts should share in the cost of having the children fly to North Carolina. I hold that she should not.

The court requested that Ms. Roberts' counsel prepare a sketch of an order reflecting the parties' agreement and the court's ruling that Dr. Roberts would be solely responsible for the children's travel costs. Instead of submitting a sketch, Ms. Roberts' counsel filed a notice of hearing for an "Emergency Suspension of Defendant's Visitation." The hearing was set for January 22, 2001. At that hearing, at which Dr. Roberts was represented by his present counsel, Ms. Roberts presented evidence to show that Dr. Roberts was

engaging in conduct detrimental to the children's best interests. Among her evidence was a letter Dr. Roberts had written to the children shortly before the hearing. The letter contained the following:

> I now want you both to think about how you have been wrong. Know this, that when you are wrong, your sin nature *will not admit* that it is wrong. Nash and Hannah, you both disobeyed Daddy, and had the evil pride to suggest that you did not agree with God almighty when he commands parents to use the rod of correction. Do you know more than God, or do you despise the fact that He has spoken to reveal His will [?] You have broken your relationship with God and with me. God says … "If we confess your [ *sic* ] sins, He is faithful and just to forgive us our sins, and to cleans [ *sic* ] us from all unrighteousness." I expect you both to repent and go to both God and me (and your new mother) for forgiveness. Sins require punishment, but repentance brings reconciliation.

Underlining in original.

After the presentation of Ms. Roberts' evidence, the court took a recess. When court reconvened, counsel announced that the parties had once again resolved their differences and the hearing was terminated. The order entered on March 2, 2001, the sketch of which was jointly submitted by counsel for the parties, contained a provision for telephone visitation and rescheduled Dr. Roberts' next scheduled in-person visitation. Otherwise, visitation was left as it was. The order, however, contained the following provision: "Jeffrey Scott Roberts shall promptly begin counseling with the counselor of his choosing focused on issues of developing further parenting skills."

The case was again removed from the court's docket. The present motion for reinstatement was filed on December 3, 2001. With that background in mind, the court now turns to the matters before it.

*1. Support*

Before a court can modify previously ordered child or spousal support, there must be agreement by the parties or a material change in circumstances. *Antonelli v. Antonelli*, 242 Va. 152, 154, 409 S.E.2d 117 (1991); *Edwards v. Lowry*, 232 Va. 110, 112, 348 S.E.2d 259 (1986). The court did not review in detail the history of this action prior to the latest hearing. Apparently, neither did counsel. At the hearing, both counsel told the court that Dr. Roberts' existing support obligation was based on an annual income for Dr. Roberts of

$350,000, and that his income in a new job that he is about to take will be $333,000. No other change in circumstances was offered by either party. When the court suggested that a reduction in Dr. Roberts' income of $17,000, or less than 5%, might not be enough to constitute a material change in circumstances, Dr. Roberts' counsel argued that it was. Ms. Roberts' counsel, however, all but abandoned the support issue and directed the rest of her evidentiary presentation and argument to the issues of custody and visitation. As the history set out above makes clear, counsel's understanding of Dr. Roberts' present support obligation was erroneous.

Presently, Dr. Roberts is paying $3,000 a month as child support pursuant to the court's order of July 21, 1999. That order, which was based upon the agreement of the parties, states that Dr. Roberts' income was $180,000 a year. There is no mention of a $350,000 salary in that order or elsewhere. Thus, to the extent that Dr. Roberts is requesting a reduction in support, such request is without any merit. There is simply no way the court will order a reduction in Dr. Roberts' support obligation based on a change in his salary to $333,000 when he took on that obligation when his salary was "only" $180,000.

With regard to Ms. Roberts' request for an increase in child support, Dr. Roberts' increased income would normally be a material change in circumstances justifying an increase. Based on Dr. Roberts' new annual income of $333,000, which is $27,750 a month, and Ms. Roberts' gross monthly income as shown on Plaintiff's Exhibit 1 of $3,035.84, however, Dr. Roberts' guideline support obligation is only $2,221.47. The court is confident that Ms. Roberts does not want less child support than she currently receives.

The evidence is also not sufficient to warrant an award of spousal support to Ms. Roberts. While the increase in Dr. Roberts' annual income from $180,000 to $333,000 is a material change in circumstances, the court finds that many of Ms. Roberts' monthly expenses as shown on Plaintiff's Exhibit 1 are simply too high. For example, she lists "Repairs/Maintenance" of $5,079.50. That amount is one-twelfth of the $60,954.22 she paid in 2001 for renovations to the house. They are not the type of continuing expenses for which Dr. Roberts should be held responsible.

The court also finds that Ms. Roberts' monthly expenses for her automobiles (nearly $1,000), pets ($140), gifts ($262.98), and vacations ($499.03) are too high. The $103.70 expense for Dr. Roberts' life insurance premium should not be listed since the parties' separation agreement requires the premium to be paid by Dr. Roberts. Her monthly legal fees of $1,018.65 should end now. The court does not know why there is a monthly moving expense of $97.

In *Floyd v. Floyd*, 1 Va. App. 42, 333 S.E.2d 364 (1985), the court said: "Spouses deemed entitled to support have the right to be maintained in the manner to which they were accustomed during the marriage...." 1 Va. App. at 45. *See also Furr v. Furr*, 13 Va. App. 479, 483-84, 413 S.E.2d 72 (1992).

When the items questioned above are adjusted or deducted from Ms. Roberts' expense statement, she does not have the monthly shortfall she claims. The court also notes that Ms. Roberts has considerable assets of her own, including her home and an investment account containing over $200,000. There is simply no need for her to receive spousal support in order to maintain the lifestyle she had with Dr. Roberts. Her request for spousal support will be denied.

## 2. Custody and Visitation

The real issues in this case are custody and visitation. As can be seen from the history set out above, it has always been the intention of the parties and the court that the children spend as much time with both parents as possible. Even when Dr. Roberts moved to Asheville, he bought a house in Charlottesville for the sole purpose of facilitating his weekly visitation, both parties at that time anticipating that Ms. Roberts and the children were about to move to Charlottesville. When Ms. Roberts decided to stay in Richmond and Dr. Roberts sold his Charlottesville house, Dr. Roberts was still allowed visitation every other weekend, something a little unusual in this court's experience when the distance is so great (approximately 368 miles according to "AOL Travel" on the Internet). Even when the parties filed petitions to alter visitation, they were almost always able to reach an agreement by the time they came to court. Unfortunately, that is not the situation now. It is Ms. Roberts' position that continued visitation between Dr. Roberts and the children is not in the children's best interests. The evidence overwhelmingly supports her view.

Dr. Roberts professes to be a deeply religious person. Throughout the hearing, he and his counsel attempted to convince the court that whatever Dr. Roberts did, he did in the exercise of his religious beliefs. The court has no reason to dispute Dr. Roberts' claim. Therefore, to the extent that he and his counsel believe it is important, the court specifically finds that Dr. Roberts' religious beliefs are firmly and honestly held. It is not the function of the court, however, to determine the sincerity or propriety of Dr. Roberts' beliefs, religious or otherwise. Rather, it is the duty of the court to do what is in the best interests of the parties' children.

Nash Roberts is twelve. He testified at the hearing. According to him, he and his ten-year-old sister do not like visiting their father because of all the Bible reading and chores they have to do. As Nash puts it, it is not fair that he and Hannah have to clean up the mess every other weekend that was made by others during the week. He also testified that he has no "free time" with his father when he is in Asheville and that he and Hannah are not allowed to look at movies on television because of the violence and language. None of those things would cause the court to modify visitation. Doing chores and reading the Bible would never serve as reasons for tweaking, much less terminating, visitation. Many parents believe that today's movies are not suitable for their children. While the court might suggest that Dr. Roberts make more of an effort to spend more quality time with Nash and Hannah, that also would not be a reason to change visitation. What concerns the court are the other things testified to by Nash and others.

It was Nash's testimony that Dr. Roberts has told him and Hannah that their mother is a fornicator and adulterer and that she will go to hell. Once, he told them that, if they died right now, they would go to hell, too. This was apparently after an episode when they obeyed Ms. Roberts instead of Dr. Roberts. On another occasion, when they were with Dr. Roberts and Ms. Roberts called, Dr. Roberts told them it was the devil calling. Nash said that he no longer mentions his mother at all in Dr. Roberts' presence because when he does, Dr. Roberts tells him not to call her "Mom" because she is a sinner, but that he should call Dr. Roberts' present wife "Mom" because she is "godly."

Nash also testified about an incident involving a recent investigation of Dr. Roberts and his present wife, Susie. The investigation, which uncovered no wrongdoing on the part of Dr. Roberts or Susie Roberts, was conducted by the local department of social services in Asheville and was instituted upon a complaint made by Mr. and Mrs. Michael McAllister. Michael McAllister is Susie Roberts' former husband. They had three children, all of whom now live with their mother and Dr. Roberts. Concerns about the well-being of those children are what led to the McAllisters' complaint. As part of the investigation, Nash was interviewed by a social services worker. After the interview, Dr. Roberts and Susie Roberts told him that he, Nash, was a spy and a master of espionage.

Ms. Roberts testified that Nash and Hannah did not want to visit their father. On the days before scheduled visits, they feigned illness or professed to be tired. When it was time for them to go, they cried and begged not to. They did not perform as well in school immediately before and after visitation, although both are excellent students. Since visitation was halted in August of

last year, something the court will say more about later, there has been a noticeable improvement in the children's dispositions and attitudes. They no longer pretend to be ill or tired and are always happy going into weekends. Hannah, particularly, is doing better in school this academic year, during which no visitation has occurred, than she did last academic year, when there was visitation.

Ms. Roberts also testified that on one occasion when Dr. Roberts spanked the children, he said he did so because God had commanded him to.[2] She said that Dr. Roberts and his present wife insisted that the children call Dr. Roberts their "godly father." He also refused to talk with her, apparently about the children's welfare or anything else. She insisted, however, that the children love their father, and that she is asking only that visitation be suspended until Dr. Roberts undergoes counseling to improve his parenting skills, something he said he would do as reflected in the agreed-upon order entered March 2, 2001. *See supra.*

Denise McAllister also testified at the hearing. As already noted, she is married to the former husband of Dr. Roberts' present wife, Susie. It was Ms. McAllister's testimony that Dr. Roberts and Susie Roberts had told Mr. McAllister's children that Mr. McAllister had deserted them and was not righteous. They told them that they, the children, were not supposed to live with nonbelievers and that the McAllisters were nonbelievers. They also told them that, since Mr. McAllister was not righteous and Dr. Roberts was righteous, Dr. Roberts was now their real father. When the children repeated these things to Mr. and Mrs. McAllister, Mr. McAllister confronted Dr. Roberts. Dr. Roberts told him that Mr. McAllister had broken his covenant with God by leaving his family and that as a result, "I am their real daddy and you're not."

Also testifying at the hearing was Erin Long. She is a teacher at Fox Elementary School where Nash was a student last year and Hannah is a student now. She testified that both children are very bright and very good students. She also said that there was always a "change in Nash's personality" when he had to visit his father. Once, Dr. Roberts came to her class while Nash was in it, and Nash was visibly uncomfortable, "just like he used to be on Mondays after visitation," or words to that effect.

The final witness for Ms. Roberts was Dr. Leigh Hagan, a clinical psychologist hired by Ms. Roberts. Dr. Hagan testified that he had met with

---

[2] Although not offered as evidence at the latest hearing, the court has already referred to a letter written to the children in which Dr. Roberts referred to God's command to parents to use the "rod of correction." *See supra.*

Ms. Roberts and the children and that he had tried to meet with Dr. Roberts. After talking with his counsel, however, Dr. Roberts refused to meet with him. It was Dr. Hagan's testimony that Nash and Hannah are "distressed" by Dr. Roberts' proselytizing and by his condemnation of their mother, as well as by Dr. Roberts' rigid, intolerable, and judgmental view of the world. He also testified, without objection, that the accounts given by the children to Ms. Roberts and others about their experiences with Dr. Roberts and Susie Roberts are not coached, but are actually what the children observe and experience. He said that Hannah is particularly at risk of psychological damage because of Dr. Roberts' telling her that women should not strive to accomplish what men accomplish and that they are supposed to be subservient to men. He further opined that the danger is not just in Dr. Roberts' teaching these things to his children, but also in the punishments meted out when they do not obey those teachings.

Dr. Roberts did not dispute much of what Ms. Roberts' witnesses said. In fact, he admitted that he has at times told the children that he was disappointed in them and that they had insulted him. He once told Nash that he, Nash, had committed "spiritual adultery" when Nash did not read the Bible when he was supposed to. He confirmed his view that Ms. Roberts is living an ungodly life.

As noted earlier, it is Dr. Roberts' and his counsel's position that Dr. Roberts' actions are protected because they are based on his religious beliefs. Also as noted earlier, it is not the court's function to determine the sincerity or propriety of those beliefs. The court notes in passing, however, that freedom of religion is not absolute, and that "[c]onduct remains subject to regulation for the protection of society." *Cantwell v. Connecticut*, 310 U.S. 296, 303-04 (1940). Still, the only real question is whether Dr. Roberts' conduct is such that continued visitation between him and the children is contrary to the children's best interests. The court finds that it is.

Whatever can be said about Dr. Roberts' conduct, it cannot be denied that it is causing serious psychological and emotional damage to the children. They pretend to be ill when it is time to see him. At least Nash is visibly uncomfortable in his presence. At least Hannah does demonstrably worse in school when visitation occurs than when it does not occur. Just as important, the values being taught to the children by Dr. Roberts are different from the values being taught to the children by Ms. Roberts. Whichever set of values is right, and the court makes no judgment on which set of values *is* right, they are irreconcilably at odds. Ms. Roberts teaches tolerance for other people's beliefs and faults; Dr. Roberts teaches "fire and brimstone." Ms. Roberts teaches love for all people; Dr. Roberts teaches love for "godly" people and not for others. Ms. Roberts encourages the children to be whatever they want

to be. Dr. Roberts tells Hannah women cannot do what men do. Ms. Roberts wants the children to love both parents. Dr. Roberts tells the children their mother is an adulterer and fornicator and will go to hell. As Dr. Hagan testified, these conflicts in what the children are being told, at their tender ages of twelve and ten, cannot be in their best interests. Indeed, the court would know that without Dr. Hagan's testimony. Anybody would. Even the most well adjusted child in the world, with two parents who had never divorced and were still living together, would have serious problems trying to reconcile the divergent views being put forward by Ms. Roberts and Dr. Roberts. When those divergent views are added to the upheaval already existing in these particular children's lives, the children's best interests are obviously not being served.

Moreover, it must be remembered that the issue before the court is not whether Ms. Roberts or Dr. Roberts should have primary custody of the children and the corresponding obligation to instill in them the moral and other values necessary to become a functioning member of society. That has already been determined. In a series of orders beginning in October 1997, as well as in the separation agreement signed in November 1997, it was agreed by both parties that the children would live with Ms. Roberts most of the time. That being true, Dr. Roberts' telling them that the person he chose to be their primary caregiver is an adulterer and fornicator and will go to hell is unconscionable. In this regard, the court totally rejects the argument made by Dr. Roberts' counsel that Dr. Roberts has a *duty* to tell his children the truth about their mother. If such duty is required by Dr. Roberts' religion, it is outweighed by the court's duty to protect the children's best interests. If such duty is not required by his religion, his conduct is nothing more than a blatant disregard for his children's best interests. Either way, the court cannot allow the situation to continue. Sole legal and physical custody of the children will be awarded to Ms. Roberts. Dr. Roberts' visitation will be terminated.

In making this ruling, the court is aware that Ms. Roberts asks only that visitation be suspended, not terminated. In the court's view, however, it makes little difference. If visitation is suspended, it will not be reinstated until Dr. Roberts demonstrates a willingness to conduct himself around the children in such a way that they are not subjected to the psychological and emotional harm just discussed. If visitation is terminated, Dr. Roberts still has the option of seeking reinstatement upon a material change in circumstances. Va. Code § 20-108; *Brown v. Brown*, 30 Va. App. 532, 538, 518 S.E.2d 336 (1999). Specifically, Dr. Roberts will have to demonstrate a willingness to conduct himself around the children in such a way that they are not subjected to the psychological and emotional harm just discussed, exactly the same thing he would have to show in order to lift the suspension that Ms. Roberts seeks.

With all the chances Dr. Roberts has already had, including the March 2001 order, in which he promised to undergo counseling to improve his parenting skills, the court feels that termination of visitation is more appropriate. This should make it clear to Dr. Roberts that the burden is on him to make the changes necessary to see his children again.

In spite of the foregoing, the court will allow Dr. Roberts to talk to his children by telephone. Such conversations shall take place between 6:30 p.m. and 8:15 p.m. every Saturday night unless otherwise agreed to by the parties and may last up to one-half hour. Ms. Roberts has the absolute right to monitor all such calls and the right to end any such call if she determines that Dr. Roberts is engaging in the type of conduct for which his in-person visitation is being terminated. No other visitation of any kind will be ordered.

### 3. *Show Cause*

Little need be said about Dr. Roberts' motion to hold Ms. Roberts in contempt of court for unilaterally suspending visitation in August 2001. It was Ms. Roberts' decision at that time that Dr. Roberts' conduct was such that continued visitation was harming the children. The court in this opinion has found that she was right. Although it would have been better if she had filed her petition for reinstatement a little earlier, she did file the appropriate motions in court. She will not be held in contempt.

Ms. Roberts also will not be held in contempt for making disparaging remarks about Dr. Roberts in the children's presence. Although the court feels it would be better if Ms. Roberts did not complain about Dr. Roberts in front of the children, nothing she said to them or in front of them is contemptuous.

### 4. *Life Insurance*

The parties' separation agreement requires Dr. Roberts to maintain a $1,000,000 insurance policy on his life with the children as beneficiaries. Ms. Roberts' Exhibit 1 shows that she has made premium payments on that policy of $1,244.40. Dr. Roberts offered no evidence to the contrary. The court will order Dr. Roberts to reimburse Ms. Roberts within thirty days. He is also admonished to abide by the agreement.

### 5. *Attorney's Fees*

The decision whether to award attorney's fees and costs in cases such as this is left to the sound discretion of the court. *See, e.g., Ingram v. Ingram,*

217 Va. 27, 29, 225 S.E.2d 362 (1976); *Jones v. Jones*, 216 Va. 161, 162, 217 S.E.2d 800 (1975); *Alphin v. Alphin*, 15 Va. App. 395, 406, 424 S.E.2d 572 (1992). Where each party has the means to pay his or her legal fees and costs, such an award is rarely appropriate. Each party has the means to pay his and her legal fees and costs here. No fees and costs will be awarded.