772 N.W.2d 96 (2009)
17 Neb. App. 678
STATE of Nebraska, appellee,
v.
Darren J. DRAHOTA, appellant.
No. A-08-628.
Court of Appeals of Nebraska.
June 16, 2009.
*98 Darren J. Drahota, pro se.
Jon Bruning, Attorney General, and George R. Love, Columbus, for appellee.
INBODY, Chief Judge, and SIEVERS and CASSEL, Judges.
SIEVERS, Judge.
This appeal involves the conviction of Darren J. Drahota for disturbing the peace. Drahota was convicted after a bench trial in the Lancaster County Court, and his conviction was affirmed on appeal to the Lancaster County District Court. Drahota has now perfected his appeal to this court.

BACKGROUND
The charge of disturbing the peace flows from an exchange of 18 e-mails beginning in late January 2006 and ending February 10, followed by two more e-mails in mid-June 2006the latter two being the subject of the charge at issue.
In late January 2006, Drahota, apparently then a student at the University of Nebraska-Lincoln, began writing to William Avery, then a professor of political science at the university, who by the end of the exchange was a candidate for election to the Nebraska Legislature and who was ultimately elected to that post, which he held at the time of trial. While it is clear from the record that Drahota and Avery had a student-professor relationship, it is not clear whether that relationship was prior to the e-mails at issue or was ongoing at the time of the exchange. In this background section, we think the stage is set most efficiently by broadly characterizing the content of the e-mails and the parties involved and then using pertinent quotations from the lengthy e-mails.
The initial series of e-mails began January 27, 2006, by Drahota to Avery and ended February 10 with an e-mail from Drahota to Avery. There are a total of 18 e-mails, 11 by Drahota and 7 by Avery, and 11 of the 18 occur in the time-frame *99 beginning with Drahota's of 2:16 a.m. on February 9 and ending with Drahota's of 12:02 p.m. on February 10. From the content of these e-mails, it appears that Drahota likely falls on the "right," or conservative, side of the conventional political spectrum, whereas Avery appears to fall to the "left," or liberal, side of the spectrum. Obviously, these are very rough generalizations intended to lend some generalized context to the initial e-mail exchange. Essentially, these 18 e-mails are an exchange of differing opinions on a variety of topics, such as the Bush presidency and its policies, the Clinton impeachment, the Iraq conflict, Muslims, terrorism, the "war on terror," the use of force in the Middle East, al Qaeda, and military service to the United States. In short, the topics of these e-mails involve issues of the day. However, Drahota's e-mails are much longer, to the point that such might be called "rants," and often laced with profanity and invective. Avery's responses, while suggesting disagreement, were quite brief. Interestingly, some portions of the e-mails from Drahota had friendly, respectful, and admiring comments about Avery and his teaching, but in the same e-mail, Drahota would include disrespectful, hostile, angry, profane, and arguably discriminatory comments about blacks, Muslims, and people on the liberal, or left, side of the political spectrum, as well as comments that certainly could be read as disrespectful and insulting to Avery.
The end of these initial exchanges occurred via Avery's e-mail of 3:35 p.m. on February 9, 2006, which responded to Drahota's sent at approximately noon that day, in which Drahota asserted that the university's football team would be good in a couple of years "if Al Queda doesn't destroy us first because of Liberals aiding them (just kidding).... You were my favorite instructor from any class .... Even though you're a liberal bum, I'll take you under my wing when the bad times come." Avery's response stated: "I will not respond to this. It is far too extreme, vile, and angry. Plus, it is full of untruths about very decent people (including me), whom you insist on accusing falsely of treason. So, let's end this." This generated an immediate response from Drahota in which he essentially asserted that his intention was to debate with an instructor and that Avery had mistaken the "tone" of his e-mails, ending with, "Let's go drink and discuss your campaign." Approximately 20 minutes later, Avery responded:
I am tired of this shit. You have accused me of being anti-American, unpatriotic, and having a mental disorder, among other things. I find this offensive and I will not engage in anymore of this with you. I served my country in uniform honorably for four years. How many have you served? Since you are so pure, so pro-American, so absolutely correct, and wonderfully patriotic, I suggest you sign-up for duty in Iraq right away and put all your claims to the test. But, of course, you will not do that. You, Michael Savage, and the "Chicken Hawks" in the Bush Administration don't have the guts!!
While the exhibit containing Drahota's response lacks a time and date, the inference is clear that it was rather immediate, and we quote pertinent portions:
Fuck you! You don't know me one bit. You are a liberal American coward. If it were up to you, you would imprison Bush before bin Laden .... I spent 18 months in Pensacola Florida before I was honorably discharged for a neck injury. You can go fuck yourself if you are going to get that way. I'd kick your ass had you said that right in front of me, but YOU don't have the guts to say that. If you think you do, just try me.... We call you people turncoats *100 and I'll be dammed if I'm going to take that kind of disrespect from someone who is so clueless as to my military background.... You contradict yourself so much that I want to puke.... You lie so much and don't show the true you....
You've really pissed me off[.]
Before Avery responded, Drahota sent another missive at 9:50 p.m. on February 9 that began, "I take that back. I would not resort to violence with you ...." This e-mail continued by recounting that Drahota had had friends who were in Iraq at the time or who had been there and that he "was absolutely hearbroke [sic] when [I] realized that I would never be able to achieve my dream of flying planes.... I was trying to be nice about everything until you assumed too much and fired me an email that was pretty scathing. Good luck[.]"
The next morning, Avery responded:
Please consider this email a request that you not contact me again for the purpose of spilling more vile. Also, I think you should know that I have saved ALL of your ranting and threatening emails and will not hesitate to turn them over to the police if I hear anything more of this nature from you. Have a nice day.
Less than an hour later, Drahota wrote a long e-mail of apology stating that he would not further contact Avery regarding politics. We quote selected portions from this lengthy e-mail sent at noon on February 10, 2006:
I am sorry for using the F-word in my email, and I apologize for saying that I would have become physical had you said that to my face. That kind of stuff goes against my own values .... I understand why you were so upset when I inferred that you were a Benedict Arnold. I do not feel that way about you.... Will you at least accept my apology.... You have taught me a lot .... You did not deserve any of the emails that I sent you. I just wanted to debate someone whom, I believe, is very knowledgeable with the opposite point of view that I foster.... I believe I have made a complete ass out of myself to my favorite instructor .... I'm sorry professor Avery and I hope you will forgive me. You're a good person and you shouldn't have to email me what you just did. Please understand that I feel bad about this.... Have a good weekend Bill, and I apologize for disrespecting you.
The above-quoted e-mail appeared to be the end of the matter, at least until 4 months later. Avery received an e-mail at his university e-mail address, dated June 14, 2006, at 11:58 p.m. from "averylovesalqueda@yahoo.com." with the subject line "Al-Zarqawi's dead...." This was followed on June 16 at 8:50 a.m. with another e-mail to Avery from the same Internet address, with the subject line "traitor." We discuss the contents of these two e-mails later in our opinion.
At this juncture, Avery contacted the Lincoln police. A police investigator traced the e-mails to a computer owned by a woman with whom Drahota lived. Drahota ultimately admitted to the investigator that he had sent the e-mails referenced above on June 14 and 16, 2006. Drahota was charged by complaint under Neb.Rev. Stat. § 28-1322 (Reissue 2008) with disturbing the peace and quiet of Avery "on or about June 14, 2006." After a bench trial before the Lancaster County Court concluding on January 30, 2007, Drahota was found guilty by oral pronouncement and fined $250. Drahota's appeal to the district court was unsuccessful, and he now appeals his conviction to this court.

*101 ASSIGNMENTS OF ERROR
Drahota's pro se appellant's brief does not contain assignments of error, but, rather, lists "Issues," and there are two, which we quote: "The Court erred in overruling Defendant's Motion To Dismiss after the State rested," and "The verdict is not sustained by sufficient evidence that proves the Defendant's guilt beyond a reasonable doubt."
Neb. Ct. R. App. P. § 2-109(D)(1)(e) requires a separate section for assignments of error, designated as such by a heading, and requires that the section be located in the sequence specified by such ruleafter a statement of the case and before a list of controlling propositions of law. To be considered by an appellate court, an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error. City of Gordon v. Montana Feeders, Corp., 273 Neb. 402, 730 N.W.2d 387 (2007). Although an appellate court ordinarily considers only those errors assigned and discussed in the briefs, the appellate court may, at its option, notice plain error. Linch v. Northport Irr. Dist., 14 Neb.App. 842, 717 N.W.2d 522 (2006). In instances where the above-referenced rules are not followed, as here, we review the record for plain error.
We note that in addition to the easy availability of such rules on the Nebraska Judicial Branch Web site, the "Self Help Center" located on the Web site is designed for pro se litigants and contains a section entitled "Find help with ... Appeal to the Supreme Court/Court of Appeals." See http://www.supremecourt.ne.gov/self-help/ (last visited June 8, 2009). There, a litigant can easily use a link to the "Citizen's Guide to the Nebraska Appellate Courts," which, among other things, emphasizes the need for compliance with § 2-109(D) concerning assignments of error. Accordingly, we review the record for plain error, bearing in mind Drahota's claim that the e-mails were protected political speech.

STANDARD OF REVIEW
Plain error is error plainly evident from the record and of such a nature that to leave it uncorrected would result in damage to the integrity, reputation, or fairness of the judicial process. Linch v. Northport Irr. Dist., supra. In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence. State v. Delgado, 269 Neb. 141, 690 N.W.2d 787 (2005). Such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the properly admitted evidence, viewed and construed most favorably to the State, is sufficient to support the conviction. Id.

ANALYSIS
The trial court found, summarized, that while there was initially some back-and-forth banter, Avery asked that it stop. Instead, Drahota waited 4 months, then created a fake address, "averyloves alqueda@yahoo.com," from which he sent the two e-mails forming the basis of the charge. Avery testified that he was "disturb[ed]" by Drahota's actions. The trial court convicted Drahota of disturbing Avery's peace.
In the two e-mails sent to Avery from the above address, with no indication that they were actually from Drahota, Drahota first wrote concerning the death of Abu Musab al-Zarqawi (a known high-level terrorist in Iraq), and asked Avery: "Does that make you sad that the al-queda leader in Iraq will not be around to behead people and undermine our efforts in Iraq? ... You ... and the ACLU should have a *102 token funeral to say goodbye to a dear friend of your anti-american sentiments."
In Drahota's e-mail of June 16, 2006, with the subject line "traitor," Drahota wrote to Avery:
I have a friend in Iraq that I told all about you and he referred to you as a Benedict Arnold. I told him that fit you very well.... I'd like to puke all over you. People like you should be forced out of this country. Hey, I have a great idea!!!! ... Let's do nothing to Iran, let them get nukes, and then let them bomb U.S. cities and after that, we will just keep turning the other cheek. Remember that Libs like yourself are the lowest form of life on this planet[.]
Therefore, looking at only the two e-mails that were sent on or about June 14, 2006, per the complaint filed against Drahota, we note that after a hiatus of 4 months, Drahota, using a libelous e-mail address, accused Avery of being aligned with a terrorist group responsible for unspeakable violence in this country as well as in Iraq against U.S. troops and Iraqi citizens. He called Avery a traitor, said that he wanted to "puke all over" him, and stated that Avery is the "lowest form of life on this planet." This hardly represents civil discourse or debate, and such accusations impugn Avery's loyalty to the United States. And by labeling him a traitor, Drahota has accused Avery of the crime of treason. The undisputed evidence is that Drahota wrote these two e-mails without identifying himself and that he used a false and libelous source for such e-mails using Avery's name. But, Drahota asserts that what he did is not the criminal act of disturbing Avery's peace. We cannot agree. The Nebraska Supreme Court has said in State v. Coomes, 170 Neb. 298, 301-02, 102 N.W.2d 454, 457 (1960):
A breach of the peace is a violation of public order. It is the same as disturbing the peace. The definition of breach of the peace is broad enough to include the offense of disturbing the peace; it signifies the offense of disturbing the public peace or tranquility enjoyed by the citizens of a community....
Breach of the peace is a common law offense. The term "breach of the peace" is generic and includes all violations of public peace, order, decorum, or acts tending to the disturbance thereof.
(Citations omitted.)
The argument that the communications of June 14 and 16, 2006, are constitutionally protected speech fails. The U.S. Supreme Court's opinion in Chaplinsky v. New Hampshire, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942), was quoted at some length by the Nebraska Supreme Court in State v. Broadstone, 233 Neb. 595, 600, 447 N.W.2d 30, 34 (1989), as follows:
"There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or `fighting' wordsthose which by their very utterance inflict injury or tend to incite an immediate breach of the peace. It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality. `Resort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution, and its punishment as a criminal act would raise no question under that instrument.' Cantwell v. Connecticut, 310 *103 U.S. 296, 309-310[, 60 S.Ct. 900, 84 L.Ed. 1213 (1940)]."
It would be difficult to author a more apt description of Drahota's actions in sending the two e-mails to Avery in June 2006, or to better explain why the two June e-mails subject him to criminal prosecution and conviction. We emphasize that while we have recounted much of the earlier e-mail exchange in late January and early February 2006, we have done so for background, and to show how what Drahota wrote in June had changed in tone and content. It is of consequence that in June, he attempted to hide his authorship, in contrast to the February exchange when he plainly identified himself. And, of course, he knew after February 10 that Avery was finished with the "discussion" and wanted no more e-mail from him. Therefore, our affirmance of the conviction is based on the June e-mails, not the exchange 4 months previously. The evidence is plainly sufficient to sustain the conviction.
AFFIRMED.